[No. S032448. Apr. 25, 1996.]

CITY OF MANHATTAN BEACH, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
JOHN P. FARQUHAR et al., Real Parties in Interest.

[No. S032449. Apr. 25, 1996.]

ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY,
Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
JOHN P. FARQUHAR et al., Real Parties in Interest.

234

**COUNSEL**

Fadem & Douglas, Jerrold A. Fadem, Berger & Norton, Michael M. Berger, Golbert, Kimball & Weiner, George Kimball, Latham & Watkins, David F. Faustman, Kim N. A. Richards, Albert Choi, Burke, Williams & Sorensen, Carl K. Newton, Timothy B. McOsker and Thomas C. Wood for Petitioner City of Manhattan Beach.

Hill, Farrer & Burrill, William M. Biting, Benjamin B. Salvaty, Dean E. Dennis, Buchalter, Nemer, Fields & Younger and Marcus M. Kaufman for Petitioner Atchison, Topeka and Santa Fe Railway Company.

No appearance for Respondent.

Sullivan, Workman and & Dee, Roger M. Sullivan and Joseph S. Dzida for Real Parties in Interest.

## OPINION

**ARABIAN, J.**—Although the era is long past when railroads dominated the landscape as well as the direction of this country's industrial, social, and political fortunes, their presence continues in legal struggles over control and ownership of property previously devoted to rail service. Typically, as in this case, the dispute concerns whether the railroad company acquired only an easement in the land over which its tracks once ran or a fee simple interest it can rightfully convey to others for nonrailroad uses. Determining the nature of its tenure requires, in the first instance, careful examination of the language in the original conveyance. If the intent of the parties is clear, that will control. If not, extrinsic evidence may be considered to the extent it informs that intent.

Here, the terms of the deed in question are too ambiguous to conclude with certainty whether the grantor and grantee, predecessors in interest of those now before this court, intended the railroad company take the property in fee simple or acquire only an easement. Resorting to extrinsic evidence of the grantor's conduct subsequent to the conveyance, we find sufficient indicia that in deeding the property it meant to dispose of its entire interest. Accordingly, the Atchison, Topeka and Santa Fe Railway Company had full legal title to convey to the City of Manhattan Beach, which thus has no obligation to compensate the real parties in interest through eminent domain proceedings, condemnation, or otherwise.

I

This action seeking to quiet title, and for inverse condemnation, ejectment, and damages, commenced almost a decade ago. The predicate facts, however, date back more than a century to 1887 when the Redondo Land Company (the RLC) acquired from Charles Silent approximately 4,500 acres of southern California property situated primarily in what is now the City of Manhattan Beach (the City). To finance the sale, Silent took back a

substantial note secured by a mortgage. Shortly thereafter, in 1888, the RLC, predecessor in interest to all but two real parties in interest (the heirs),[1] conveyed a portion of the property to the Redondo Beach Railway Company (the railway), predecessor in interest to the Atchison, Topeka and Santa Fe Railway Company (Santa Fe). The current controversy concerns the nature of the interest passed by that conveyance.

The deed memorializing the transaction between the parties provided in part that the RLC and Charles Silent "for and in consideration of the sum of one dollar" "remise[d], release[d] and quit-claim[ed]" to the railway "the right of way for the construction, maintenance and operation of a Steam Railroad, upon[,] over and along the following tract and parcel of land, . . . and described as follows, to wit, Being a strip of land of the uniform width of 100 feet, 50 feet thereof being on each side of and parallel to the center line of location of The Redondo Division of the California Central Railway, over and through the lands of grantors . . . ." The document then set forth a detailed metes and bounds description of a several-mile course meandering through what would become Manhattan Beach and portions of Hermosa Beach. The total acreage constituted "an area of 32.46 acres of land, more or less." The grantors reserved and excepted "a space of 200 feet in length lying next adjacent to and midway between the ends of the side track now constructed upon said right of way and extending to the next adjacent boundary line of said right of way for the full length of said 200 feet."

Certain conditions attached to "this grant": "that the side track now constructed upon said right of way shall be maintained and shall be used as a station to receive and discharge freight; that such convenient crossings, not less than four shall be made and maintained with sufficient cattle guards at such point on said right of way as may be necessary for the full use and enjoyment of the lands adjoining said right of way, and so as to give access to and from the lands on either side thereof; that such culverts shall be constructed and maintained as may be necessary for the free passage of water across the same, and so located that the lands adjacent to said right of way will not be flooded on account of the roadbed of said railroad forming an embankment . . . ." Noncompliance with any of these conditions would result in a reversion to the grantors and their successors in interest.

The deed concluded with a habendum clause: "To have and to hold all and singular the rights aforesaid unto [the railway] and its assigns and successors

---

[1] The real parties in interest include John P. Farquhar and Ricardo Bandini Johnson, described as "two hobbyist 'heir hunters,'" as well as more than 80 individuals and institutions purportedly heirs of RLC grantees and successors in interest over the last century. Apparently, Farquhar and Johnson instigated the litigation on behalf of the heirs claiming the cessation of railroad operations terminated any further interest in the property because the railway had acquired only an easement limited to that use and purpose.

forever, subject however to and upon the terms and conditions aforesaid." Both the president of the RLC and Charles Silent signed as grantors.

During the course of its existence over the next 15 years, the RLC entered into various transactions for the sale, option for sale, or partition of its remaining property, which will be discussed in greater detail as they become relevant. In 1897, the RLC, the railway, and one Parvin Wright, who held an option on 463 acres, signed an unrecorded indenture abrogating the reversionary conditions in the original deed as long as the railway maintained a station at Potencia, between Los Angeles and Redondo Beach. Unlike the earlier conditions, maintenance of the station did not include a reverter provision.

In 1896, the stockholders initiated partition and distribution of property and other interests of the corporation. To effectuate the process, the RLC conveyed the remainder of its holdings to a trustee, who in turn distributed the land to the stockholders through deeds identifying each parcel by lot number. In 1901, the RLC also instituted a quiet title action to resolve issues of title concerning Parvin Wright's option and claims by heirs of former Spanish and Mexican grantees. By 1903, the RLC had concluded its business and formalized its corporate dissolution through judicial proceedings. The resulting order reflected a finding that "all of the property of said corporation has been disposed of."[2]

The railway and its successors, the last of which was Santa Fe, continued operations until 1982, when all rail activity ceased. Santa Fe leased the property to the City in that year and eventually sold it in 1986. The strip now functions as a transportation corridor through the City with a median park and jogging path lying between two major north-south thoroughfares.

In 1987, the heirs instituted this action against the City and Santa Fe by which they sought to exercise powers of termination allegedly created by the 1888 deed due to abandonment of rail services, to quiet title to the property, and to claim damages for inverse condemnation. The trial court trifurcated the proceedings, first determining the nature of the estate granted by the RLC in the original deed and reserving questions of heirship and damages. In the first phase, the court concluded the RLC had not conveyed a fee simple interest but only an easement, which terminated when Santa Fe discontinued railroad operations. It further found Santa Fe as well as the City liable to the heirs for inverse condemnation.

---

[2]Apparently, none of the parties to the present litigation were aware of this dissolution proceeding until shortly before oral argument in the Court of Appeal. The City and Santa Fe requested and were granted judicial notice of the superior court file. We grant their renewed request in this court. (Evid. Code, § 452, subd. (d).)

The Court of Appeal summarily denied writ review. On petition for review by the City and Santa Fe, this court transferred the matter with directions to issue an alternative writ. The Court of Appeal upheld the trial court's findings as to both title and liability. With respect to title, the court agreed the terms of the deed itself adequately established the intent of the original parties to convey an easement only; it found relevant extrinsic evidence also supported that conclusion. On the question of Santa Fe's liability, the court reasoned it could be held responsible in damages under a park acquisition agreement entered into in 1986 by which it quitclaimed its interest to the City.

## II

We begin our analysis of the parties' legal claims with some of the basic principles of law governing review in these cases:

■ With deeds as any other contracts, "[t]he primary object of all interpretation is to ascertain and carry out the intention of the parties. [Citations.] All the rules of interpretation must be considered and each given its proper weight, where necessary, in order to arrive at the true effect of the instrument. [Citation.]" (*Burnett* v. *Piercy* (1906) 149 Cal. 178, 189 [86 P. 603]; Civ. Code, § 1066; see Civ. Code, § 1635 et seq.; Code Civ. Proc., § 1856 et seq.) "Extrinsic evidence is 'admissible to interpret the instrument, but not to give it a meaning to which it is not susceptible' [citations], and it is the instrument itself that must be given effect. [Citations.] It is therefore solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence. Accordingly, 'An appellate court is not bound by a construction of the contract based solely upon the terms of the written instrument without the aid of evidence [citations], where there is no conflict in the evidence [citations], or a determination has been made upon incompetent evidence [citation].' [Citations.]" (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839], fn. omitted.)[3] We shall discuss other rules of construction as they become pertinent.

Beginning with an examination of the terms of the deed, the granting clause states the RLC and Charles Silent "remise, release and quit-claim" to

---

[3]In a footnote accompanying this text, the court disapproved language in *Estate of Rule* (1944) 25 Cal.2d 1, 11 [152 P.2d 1003, 155 A.L.R. 1319], to the effect that an appellate court must accept the trial court's interpretation of a written instrument when conflicting legal, rather than factual, inferences may be drawn. " 'The very possibility of . . . conflicting inferences, actually conflicting interpretations, far from relieving the appellate court of the responsibility of interpretation, signalizes the necessity of its assumption of that responsibility.' [Citation.]" (*Parsons* v. *Bristol Development Co., supra,* 62 Cal.2d at p. 866, fn. 2.) In this case, "there is no conflict in the . . . evidence" (*id.* at p. 866); therefore, the trial court did not resolve any disputed facts or have occasion to draw inferences therefrom.

the railway the property in question. ■ "The operative words used, 'release, remise and quitclaim' are the words commonly used in simple quitclaim deeds. [Citation.]" (*Estate of Rose* (1937) 23 Cal.App.2d 686, 688 [73 P.2d 1232].) "A quitclaim deed transfers whatever present right or interest the grantor has in the property. [Citation.]" (*Westlake* v. *Silva* (1942) 49 Cal.App.2d 476, 478 [121 P.2d 872]; *Rosenthal* v. *Landau* (1949) 90 Cal.App.2d 310, 313 [202 P.2d 810]; see also 2 Miller & Starr, Current Law of Cal. Real Estate (2d ed. 1989) § 6:12, pp. 503-505; Black's Law Dict. (4th ed. 1968) p. 1417, col. 1 [quitclaim "intended to pass any title, interest, or claim which the grantor may have in the premises"].) More specifically, "it has been often decided by this court that a quitclaim deed conveys the absolute fee-simple title if the party executing it had such title [citations]; and therefore such deed does not imply any precedent interest or easement in the releasee, or any admission of the releasor to that effect." (*Spaulding* v. *Bradley* (1889) 79 Cal. 449, 456 [22 P. 47].) "In this State, from the earliest times, quitclaim deeds have been in every-day use for the purpose of transferring title to land, and have been considered as effectual for that purpose as deeds of bargain and sale."[4] (*Graff* v. *Middleton* (1872) 43 Cal. 341, 344.) Indeed, as early as 1854, this court recognized and held a quitclaim deed to effect a transfer of "all the right and title of the grantor." (*Sullivan* v. *Davis* (1854) 4 Cal. 291, 292; see *Wholey* v. *Cavanaugh* (1891) 88 Cal. 132, 135 [25 P. 1112]; *Rego* v. *Van Pelt* (1884) 65 Cal. 254, 256 [3 P. 867]; *Graff* v. *Middleton, supra,* 43 Cal. at p. 344; see also *Lawrence* v. *Ballou* (1869) 37 Cal. 518, 521.)

The phrase "remise, release and quit-claim" in the granting clause is thus not consistent with an intent to convey to the railway only an easement: The RLC held the property in fee simple; and the choice of the quitclaim deed form, with its established legal import, substantially reflects an intention to convey title in its entirety.[5] (See *Estate of Rose, supra,* 23 Cal.App.2d at p. 688; *MacFarland* v. *Walker* (1919) 40 Cal.App. 508, 511-512 [181 P. 248].)

---

[4]As with the use of "quitclaim," reference to "remise" and "release" generally signifies a relinquishment of all interest held by the grantor. (See Black's Law Dict., *supra,* p. 1454, col. 1 ["release"]; *id.,* p. 1458, col. 2 ["remise"].)

[5]The heirs argue the quitclaim form was used only to disavow any warranty as to encumbrances in light of the mortgage held by Charles Silent. (See Civ. Code, § 1113.) However, on this point a different explanation appears equally plausible: At the time of the transaction, Civil Code section 1624 did not yet require a written recitation, in the deed or otherwise, by which the purchaser of real property agreed to assume an indebtedness secured by a mortgage. (See Civ. Code, § 1624, subd. (f), added by Stats. 1937, ch. 316, § 2, p. 695.) Instead, assumption of such an obligation "may [then] be made orally or in a separate instrument; it may be implied from the transaction of the parties, or it may be shown by the circumstances under which the purchase was made, as well as the language used in the agreement." (*Hopkins* v. *Warner* (1895) 109 Cal. 133, 138 [41 P. 868]; *Andrews* v. *Robertson* (1918) 177 Cal. 434, 438-439 [170 P. 1129]; *Hibernia Sav. etc. Soc.* v. *Dickinson* (1914) 167

Resolution of the heirs' claims cannot rest on this factor alone, however. As noted above, "[d]eeds are to be construed like any other contract and the intent of parties arrived at by a consideration of the whole instrument and not of detached clauses. [Citation.]" (*Whitcomb* v. *Worthing* (1916) 30 Cal.App. 629, 631 [159 P. 613]; *Parks* v. *Gates* (1921) 186 Cal. 151, 154 [199 P. 40].) Examining the remainder of the conveyance, we find other provisions support the opposite conclusion: the grantor intended to limit the conveyance to an easement.

The most significant counterpoint is the deed's multiple references to "right of way."[6] (See Civ. Code, § 801.) In *Highland Realty Co.* v. *City of San Rafael* (1956) 46 Cal.2d 669, 678 [298 P.2d 15], this court noted "the general rule . . . that 'in construing contracts and deeds for railroad rights of way such deeds are usually construed as giving a mere right of way, although the terms of the deed would be otherwise apt to convey a fee. [Citations.]' "[7] (See also *Parks* v. *Gates, supra,* 186 Cal. at p. 154.) This observation reflects the broad view of many jurisdictions "that when the granting clause of a deed declares the purpose of the grant to be a right of way for a railroad the deed passes an easement only, and not a fee with a restricted use, even though the deed is in the usual form to convey a fee title." (*Swan* v. *O'Leary* (1950) 37 Wn.2d 533, 537 [225 P.2d 199, 201]; see

---

Cal. 616, 621-624 [140 P. 265].) In this case, "the transaction of the parties" and "the circumstance under which the purchase was made" included having Charles Silent sign as a grantor, thereby reflecting his implicit agreement to forbear further enforcement of his mortgagee interest.

[6]The heirs emphasize this language and cite cases from other jurisdictions for the proposition the quitclaim of a "right of way" conveys only an easement. These out-of-state authorities bear little, if any, relevance to our inquiry, which must parse every provision in search of intent including the quitclaim deed form itself. Moreover, one may readily note opinions from jurisdictions holding a quitclaim conveyed a fee interest under similar language. (See, e.g., *Arkansas Improvement Co.* v. *Kansas City So. Ry. Co.* (1938) 189 La. 921 [181 So. 445]; see also, *post,* fn. 8.) In the final analysis, we must remain focused upon this particular conveyance, considering all the terms chosen by these parties, as evidence of their intent.

[7]*Highland Realty Co.* v. *City of San Rafael, supra,* is distinguishable principally because in that case the deed was given to settle a pending condemnation action in which the railroad could have acquired an easement only. The deed mirrored the language of the eminent domain complaint as well as a court order authorizing the railroad to take possession of the right of way. Not surprisingly under the circumstances, this court concluded the conveyance transferred a limited interest, i.e., "exactly that which the railroad sought" in condemnation. (46 Cal.2d at p. 676.) In the context of this case, it is thus unnecessary to assess whether it remains the "general rule" that the grant of a railroad right-of-way conveys only an easement. (But see *Machado* v. *Southern Pacific Transportation Co.* (1991) 233 Cal.App.3d 347, 355-356 [284 Cal.Rptr. 560].)

generally, Annot., Deed to Railroad Company as Conveying Fee or Easement (1966) 6 A.L.R.3d 973, 1013-1024.)[8] The parties thus appear to have drawn the terms of their deed to include two material but conflicting provisions, with "remise, release and quit-claim" reflecting an intent to convey a fee simple interest and references to "right of way" indicating an easement.

■ Compounding the ambiguity, courts have also concluded "the term 'right of way,' when applied to railroads, canals, and similar instrumentalities, has no exact, well-defined meaning, but often is susceptible of a twofold signification. It is used indiscriminately to describe, not only the easement, or special and limited right to use another person's land, but as well the strip of land itself that is occupied for such use. This, at any rate, is the case when the term is used with respect to railroads. [Citations.]"

[8]In his dissent, Justice Mosk cites Annotation, Deed to Railroad Company as Conveying Fee or Easement (1941) 132 A.L.R. 142 as well as numerous decisions from other jurisdictions in support of various points of his argument that the deed conveyed an easement only. In their specifics, most out-of-state cases are of marginal relevance to this grantor's intent because each arises from a particular matrix of facts, which generates its own individual rationale. Some also depend upon policy or other considerations not pertinent to our evaluation. For example, some states expressly regulate property holdings by railroads. (See, e.g., *City of Oakland* v. *Schenck* (1925) 197 Cal. 456, 466 [241 P. 545] [by statute railroads in Illinois may not hold land as ordinary owner]; *East Alabama Railroad Co.* v. *Doe* (1885) 114 U.S. 340, 352 [29 L.Ed. 136, 140, 5 S.Ct. 869] [policy derived from Alabama Constitution requiring "just compensation" limits railroads to "only a right to use for its purposes" and not absolute title]; *Ross, Inc.* v. *Legler* (1964) 245 Ind. 655 [199 N.E.2d 346, 348] [policy considerations do not favor permitting railroads to acquire rights of way in fee simple]; *Abercrombie* v. *Simmons* (1905) 71 Kan. 538 [81 Pac. 208, 210] [legislative restrictions on scope of property interests acquired by railroads]; *State* v. *Union Electric Co. of Missouri* (1941) 347 Mo. 690, 696-697 [148 S.W.2d 503, 505-506] [statute permitting street railway company to acquire right-of-way by grant did not include power to acquire fee].) By contrast in California, although the law contains some statutes expressly governing certain railroad activities (see Pub. Util. Code, § 7503 et seq.), it has never circumscribed the nature of the property interests they may acquire. (*Id.*, § 7526; see *Midstate Oil Co.* v. *Ocean Shore R. R. Co.* (1928) 93 Cal.App. 704, 707 [270 P. 216]; cf. *People* v. *Thompson* (1954) 43 Cal.2d 13, 19 [271 P.2d 507].)

More to the point, other out-of-state opinions, in their own particulars, support the determination the railway obtained a fee estate. However, their citation would simply provoke an endless and ultimately inconclusive volley of decisional "authority" purportedly vindicating each conclusion. We thus agree with the response of the Washington Supreme Court in *Swan* v. *O'Leary*, *supra*, 37 Wn.2d at page 535 [225 P.2d at page 200]: "The parties have cited and analyzed many cases, and have referred us to the annotation in 132 A.L.R. 142. The authorities are in hopeless conflict. They cannot be reconciled, because their authors approach the subject from different standpoints and give different weight and significance to the various factors entering into the various instruments of conveyance under consideration. About the only common ground that can be found is that the intention of the parties to the conveyance is of paramount importance and must ultimately prevail in a given case." (See, e.g., *Parks* v. *Gates*, *supra*, 186 Cal. at pp. 154-155.) These same observations apply equally to the superseding annotation at 6 A.L.R.3d 973 and cases cited therein.

(*Anderson* v. *Willson* (1920) 48 Cal.App. 289, 295 [191 P. 1016]; *People* v. *Thompson, supra,* 43 Cal.2d at pp. 19-20; *Parks* v. *Gates, supra,* 186 Cal. at p. 155; *Machado* v. *Southern Pacific Transportation Co., supra,* 233 Cal.App.3d at p. 354; *Concord & Bay Point Land Co.* v. *City of Concord* (1991) 229 Cal.App.3d 289, 295 [280 Cal.Rptr. 623]; *City of Glendora* v. *Faus* (1957) 148 Cal.App.2d 920, 926 [307 P.2d 976]; *Ocean Shore Railroad Co.* v. *Doelger* (1954) 127 Cal.App.2d 392, 399 [274 P.2d 23]; see generally, 5 Miller & Starr, Current Law of Cal. Real Estate, *supra,* § 15:17, pp. 441-442; Annot., Deed to Railroad Company as Conveying Fee or Easement, *supra,* 6 A.L.R.3d 973, 977; Black's Law Dict., *supra,* p. 1191.)[9]

■ We therefore turn to the statutory rules governing the interpretation of deeds to determine if they contain an answer to the stalemate.[10] To begin, the law presumes "[a] fee simple title is . . . intended to pass by a grant of real property, unless it appears from the grant that a lesser estate was intended." (Civ. Code, § 1105; *City of Long Beach* v. *Marshall* (1938) 11 Cal.2d 609, 613 [82 P.2d 362].) This precept applies without distinction to quitclaim deeds (see *Carlson* v. *Lindauer* (1953) 119 Cal.App.2d 292, 306 [259 P.2d 925]; *MacFarland* v. *Walker, supra,* 40 Cal.App. at p. 512) and supports the finding of a fee conveyance. Civil Code section 801 tends to favor a contrary finding: "The following land burdens, or servitudes upon land, may be attached to other land as incidents or appurtenances, and are then called easements: [¶] . . . [¶] . . . The right-of-way . . . ."

Other provisions generally sustain a fee interest. "If several parts of a grant are absolutely irreconcilable, the former part prevails." (Civ. Code, § 1070.) The quitclaim deed form itself would seemingly constitute "the former part" and thus assume primacy over subsequent inconsistent references to "right of way." (See *Castro* v. *Tennent* (1872) 44 Cal. 253, 258.) With its dual meaning, "right of way" is also less definite than "remise, release and quit-claim." (See Civ. Code, § 1067.) "Where there is an asserted modifying or limiting clause in a deed, if such clause be of doubtful import, the fee contemplated by the granting clause of the deed will not be cut down. [Citation.]" (*Litten* v. *Warren* (1936) 11 Cal.App.2d 635, 637 [54 P.2d 39]; *Castro* v. *Tennent, supra,* 44 Cal. at p. 258.) The general rule also provides "[t]hat doubtful clauses in the deed are to be construed most strongly against

[9]Thus, for example, in *Midstate Oil Co.* v. *Ocean Shore R. R. Co., supra,* 93 Cal.App. at page 708, the conveyance referred to "said right of way," which the reviewing court held did not limit the interest acquired by the railway company to an easement. Measuring the deed by its own terms, the court found instead it conveyed title in fee simple. (*Ibid.*; see *Faus* v. *City of Los Angeles* (1961) 195 Cal.App.2d 134, 141 [15 Cal.Rptr. 783]; *Palmer* v. *Los Angeles, etc. Ry. Co.* (1921) 55 Cal.App. 519, 521 [203 P. 1012]; *Hannah* v. *Southern Pac. R. R. Co.* (1920) 48 Cal.App. 517, 521 [192 P. 304].)

[10]All cited statutory provisions were enacted in their present form in 1872.

the grantor, and as favorably to the grantee as the language, construed in the light of the surrounding facts, will justify." (*Castro* v. *Tennent, supra,* 44 Cal. at pp. 257-258; Civ. Code, § 1069; *Hager* v. *Spect* (1878) 52 Cal. 579, 582; *Salmon* v. *Wilson* (1871) 41 Cal. 595, 608.)

Although these statutory principles tend to weight the "fee" side of the calculus, we find them neither individually nor collectively dispositive of the parties' intent, the ultimate interpretive touchstone. Thus, we must examine the remainder of the document to assess whether any other provisions, singly or in combination, assist our task. (See *Machado* v. *Southern Pacific Transportation Co., supra,* 233 Cal.App.3d at pp. 353-354.) ▮ In this effort, we bear in mind that "since the language of each instrument is sui generis, no bright-line rules of construction are available to us to aid in this endeavor. 'Analysis of cases on this subject makes it abundantly clear that it is impossible to lay down an invariable and universal rule of construction. [Citation.] Every transaction must be considered individually.' [Citation.]" (*Id.* at p. 353, quoting *Basin Oil Co.* v. *City of Inglewood* (1954) 125 Cal.App.2d 661, 664 [271 P.2d 73] (opn. by Mosk, J.); see also *Eldridge* v. *See Yup Company* (1860) 17 Cal. 44, 51; fn. 8, *ante.*)

▮ Following the initial reference to "right of way," the deed recites that it is "for the construction, maintenance and operation of a steam railroad . . . ." In some instances, courts construe language relating to an intended purpose as indicative of a limited conveyance, although this construction generally prevails when there is some qualification such as "*only* for the construction, etc." That is, if prescriptive and thus restricted, a statement of purpose evidences an easement; if merely descriptive and thus unrestricted, the grant is considered not inconsistent with a fee.[11] "[T]he vast majority of cases hold the transfer of a fee title is not vitiated solely for the reason that the deed contains a clause declaring the purpose for which it is intended the

---

[11]See, e.g., *Yuba Inv. Co.* v. *Yuba Consol. G. Fields* (1920) 184 Cal. 469, 475 [194 P. 19] (no express provision limiting grantee's use to particular purpose—fee conveyed); *Pellissier* v. *Corker* (1894) 103 Cal. 516, 517 [37 P. 465] ("for the sole purpose of"—easement created); *Machado* v. *Southern Pacific Transportation Co., supra,* 233 Cal.App.3d at pages 357-359 (grant " 'for a right of way for a standard gauge railroad' "—fee conveyed); *Johnson* v. *Ocean Shore Railroad Co.* (1971) 16 Cal.App.3d 429, 434 [94 Cal.Rptr. 68] ("for railroad purposes only"—easement); *City of Glendora* v. *Faus, supra,* 148 Cal.App.2d at page 926 (grant "for railroad purposes only"—easement); *Basin Oil Co.* v. *City of Inglewood, supra,* 125 Cal.App.2d at pages 664, 662 ("unlimited and unqualified" grant for "public street or right-of-way"—fee conveyance); *Tamalpais etc. Co.* v. *N. W. Pac. R. R. Co.* (1946) 73 Cal.App.2d 917, 928-929 [167 P.2d 825] (" 'for uses and purposes aforesaid and none other' "—easement); *Cooper* v. *Selig* (1920) 48 Cal.App. 228, 229 [191 P. 983] (" 'for the purposes of a public road' "—fee conveyed); see Restatement of Property section 471, comment d, page 2964; compare *Estate of Rose, supra,* 23 Cal.App.2d at page 688 (absence of reference to future contingency in quitclaim deed "indicate[d] a present transfer of any interest the owner might have in the property at the time of the conveyance," without

granted premises shall be used. This is particularly indicated where such purpose will not inure specially to the benefit of the grantor and his assigns, but is in its nature for the general public, and where there are no other words indicating an intent that the grant be void if the declared purpose is not fulfilled." (*Basin Oil Co.* v. *City of Inglewood, supra*, 125 Cal.App.2d at p. 664.)[12] Nevertheless, as with the term "right of way" itself, in this instance reference to purpose tends as much to obscure as to clarify the parties' intent.

The deed further recites that "the right of way for the construction, maintenance and operation of a steam railroad, [is] *upon*[,] *over and along the following tract and parcel of land*" and "*over and through* the lands of grantors . . . ." (Italics added.) This language in the nature of an appurtenance appears to limit the railway to a right of passage and exclude title to the land beneath. (See *Highland Realty Co.* v. *City of San Rafael, supra*, 46 Cal.2d at p. 678.) Subsequently, however, the deed refers to "a strip of *land*" 100 feet in width and sets forth a detailed legal description in metes and bounds, which "contain[s] an area of 32.46 acres of *land*, more or less," according to its terms. (Italics added.) References to "land," particularly in conjunction with precise and technical designation of the location, generally indicate an intention to transfer the entire estate not just a limited right to pass over the property. (See *Moakley* v. *Blog* (1928) 90 Cal.App. 96, 98-99 [265 P. 548].)

Other indicia conforming to an intent to convey a fee include the grantor's reservation of a space for a warehouse, which would be inconsistent with retaining any larger estate in the property. "[W]hen an interest is 'reserved,' the entire fee title is transferred to the grantee and the grantee grants back a new interest to the grantor." (5 Miller & Starr, Current Law of Cal. Real Estate, *supra*, § 15:18, p. 445; see *id.*, § 15:5, p. 402 ["By definition an easement is necessarily an interest in the land of another."].) The deed also identifies itself as "[t]his grant," which "is made upon [various] condition[s]" failure of which would cause the right of way "to revert" to the RLC. "[A]n easement . . . does not 'revert' to the grantor, it is simply extinguished. [Citation.]" (*Concord & Bay Point Land Co.* v. *City of Concord, supra*, 229 Cal.App.3d at p. 295.) Hence, this language also implies a complete rather than partial transfer of interest in the property. (See *City of Long Beach* v. *Marshall, supra*, 11 Cal.2d at p. 613; *Schlageter* v. *Cutting* (1931) 116 Cal.App. 489, 498 [2 P.2d 875]; Civ. Code, § 1105.)

qualification of the estate transferred); *Midstate Oil Co.* v. *Ocean Shore R. R. Co., supra*, 93 Cal.App. at page 708 (deed failing to limit railroad company's use conveyed fee).

   [12]Even words of limitation are not dispositive; in one early case this court found the grantee acquired a fee estate notwithstanding a recital in the deed that the " 'conveyance of these lands is made for railroad purposes only.' " (*Behlow* v. *Southern Pac. R. R. Co.* (1900) 130 Cal. 16, 18 [62 P. 295]; see also *City of Long Beach* v. *Marshall, supra*, 11 Cal.2d at p. 613.)

The nominal consideration ($1) militates to the contrary (see *Tamalpais etc. Co.* v. *N. W. Pac. R. R. Co.*, *supra*, 73 Cal.App.2d at pp. 927-928; Rest., Property, § 471, com. f, p. 2966), although, assuming the recitation in the deed reflects the actual bargained for exchange, the grantor may well have had more interest in the relative benefits it expected to derive from the railway's presence. (See *Machado* v. *Southern Pacific Transportation Co.*, *supra*, 233 Cal.App.3d at pp. 359-360; *Concord & Bay Point Land Co.* v. *City of Concord*, *supra*, 229 Cal.App.3d at pp. 296-297; see also, *post*, at p. 248.)

The document in question does not refer to an easement. "In construing the instrument we cannot overlook the fact that if the grantors really intended to convey only an easement, they could have easily so expressed that purpose. [Citations.] [¶] Their failure to do so must be considered together with the presumption that a fee simple title passed (Civ. Code, § 1105) and the rule that a grant is to be interpreted in favor of the grantee. (Civ. Code, § 1069)." (*Basin Oil Co.* v. *City of Inglewood*, *supra*, 125 Cal.App.2d at p. 666.) Nonetheless, the omission does not factor substantially in our equation since the parties possibly used "right of way" as an equivalent. By the same token, the deed does not contain any reference to a fee (cf. *ibid.*); but use of the quitclaim deed form may account for that.

Neither does the habendum clause shed particular light on our inquiry. Its terms are not inconsistent with the grant of a fee. (See *Concord & Bay Point Land Co.* v. *City of Concord*, *supra*, 229 Cal.App.3d at pp. 295-296; *Parks* v. *Gates*, *supra*, 186 Cal. at p. 155.) But that conclusion somewhat begs the question in light of the qualification "subject however to and upon the terms and conditions aforesaid." As we have discussed, the "terms and conditions aforesaid" can variously be construed as evidence of either a fee or an easement; none are dispositive.

Finally, we note Charles Silent, the mortgage holder, as well as the president and secretary of the RLC signed the deed. Although there are other possibilities, this fact suggests the parties attempted to effectuate a complete and unqualified transfer of all rights and title to the railway. (See, *ante*, fn. 5.)

Having canvassed the four corners of the deed, we end our search frustratingly little more informed of the parties' intention than when we began. Judging by the terms "remise, release and quit-claim" and "right of way," the grantor appears to have intended at one and the same time to convey to the railway the entire fee estate and a limited interest confined to an easement for railroad purposes. The remainder of the language is equally

ambiguous, both supporting and contradicting one or the other conclusion. We thus turn to extrinsic evidence in the hope of enlightenment.

### III

■ "It is well settled that a deed indefinite in its terms may be made certain by the conduct of the parties acting under it. [Citations.]" (*People* v. *Ocean Shore Railroad* (1948) 32 Cal.2d 406, 414 [196 P.2d 570, 6 A.L.R.2d 1179].) In this regard, "[t]he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible. [Citations.]" (*Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373].)

■ The evidence before the court includes several subsequent documents executed by the RLC dealing with its property, including the portion deeded to the railway. Unlike the terms of the 1888 conveyance itself, these references to the railway's interest are virtually without qualification consistent with an intention to transfer the property in fee simple.

To begin, in 1897 the grantor and the grantee's successor along with Parvin Wright entered into an unrecorded indenture modifying the reversionary conditions of railroad operations. In reference to the 1888 conveyance, the indenture states the earlier "deed shall remain a *grant* as therein expressed." (Italics added.) This language suggests and comports with the conclusion the RLC considered full title had passed by "grant." (Cf. *Schlageter* v. *Cutting, supra,* 116 Cal.App. at p. 498.)

Commencing in 1896, the RLC initiated various transactions eventually to divest itself of its holdings by partition. These included corporate resolutions in 1896 and 1897, an 1897 shareholder agreement, and an 1897 trust deed. Significantly, among those involved in executing, and presumably preparing, these documents was Hugh W. Vail, who as secretary of the RLC had signed the 1888 conveyance and would have been knowledgeable as to the grantor's intent at that time. In all instances, the description "excepted" "that certain right of way . . . granted" to the railway as well as parcels of land deeded to Blanton Duncan and the option given Parvin Wright, i.e., all property subject to claim by others. Had the RLC conveyed only an easement to the railway, that interest would simply have passed as an appurtenance with any subsequent transfer. (See *Moylan* v. *Dykes* (1986) 181 Cal.App.3d 561, 568 [226 Cal.Rptr. 673].)

The partition also necessitated a quiet title action in 1901 from which the RLC expressly excepted the railway's property. This proceeding is significant in two respects: First, the exception of the railway's property lying within the area at issue in the quiet title action indicates the RLC no longer considered it held any interest therein. If it had conveyed only an easement to the railway, it would most likely have needed and wanted to settle ownership of the underlying fee at that time.

Second, the typewritten complaint "except[s] from the lands" subject to the action "the strip of land" conveyed to the railway in 1888 with the metes and bounds description taken from the earlier deed. Beneath that description, the RLC's president, who verified the pleading, interlineated in his own hand "and being the lands conveyed to the [railway] by [the 1888 deed]." Moreover, not only does the complaint contain these specific references to "land," at no point does it identify the railway's holding as a "right of way." These representations were made by the RLC in a legal proceeding instigated to resolve title to relevant portions of its holdings; and the judgment incorporates them verbatim. As such, they stand as virtually incontrovertible evidence the grantor intended the 1888 deed to convey the property to the railway in fee simple. (Cf. *Anderson* v. *Willson, supra,* 48 Cal.App. at p. 295.)

Of equal significance, when the RLC dissolved as a corporation in 1903, the decree of dissolution reflected "that all of the property of said corporation has been disposed of." Taking this language at face value, we must perforce find the railway acquired a fee, not merely an easement. The strip of land at issue had been "excepted" from the distribution to shareholders under the terms of the partition and hence had not passed to them in any form. The RLC had not otherwise divested itself of the interest but by deed to the railway in 1888. Therefore, it could not have concluded its corporate business with this representation unless it believed it had originally conveyed full title to the property by that transaction. Elsewise, we would have to conclude the RLC intended, contrary to the terms of the decree and after it ceased to exist as a corporate entity, to retain a fee estate in a narrow strip of land subject to an easement the duration of which no one could predict.

If not unreasonable, such a conclusion is at least implausible. (Cf. *Merchant* v. *Grant* (1915) 26 Cal.App. 485, 490 [147 P. 484] ["unreasonable" to hold grantors intended to retain ownership of land "which could have been of no possible use to them"].) The record contains no evidence the RLC, as a land development company, intended to maintain a continuing ownership

interest it could reassert in the event railroad operations ceased.[13] (Cf. *Tamalpais etc. Co.* v. *N. W. Pac. R. R. Co., supra,* 73 Cal.App.2d 917.) Indeed, the purpose of the enterprise appears quite to the contrary since partition and distribution activities began within a decade after it purchased the 4,500-acre tract, and the corporation dissolved within less than 2 decades.[14]

Construing the conveyance as a fee also best effectuates the likely intent of the parties considering the broader context in which the transaction took place: "This was before automobiles were in common use and Manhattan Beach, strange as this now seems, was quite inaccessible to Los Angeles, which had barely started its phenomenal growth. Until 1904, when the Pacific Electric Railroad was completed, the only means of transportation to Manhattan Beach was by the Santa Fe Railroad. Excursion parties were organized for prospective purchasers, and they were taken to the property by train." (*Manhattan Beach* v. *Cortelyou* (1938) 10 Cal.2d 653, 664 [76 P.2d 483].) The RLC's business was to sell property in this "quite inaccessible" location; only the presence of the railway could make such a venture economically feasible much less viable. Granting the railway full title rather than a limited interest would have been at least as consistent, if not more so, with achieving this goal. (Cf. *United Inv. Co.* v. *Los Angeles etc. Ry. Co.* (1909) 10 Cal.App. 175, 184 [101 P. 543] ["enhancement of [land] values in the vicinity" due to railroad's agreed construction of road sufficient consideration for conveyance of fee interest to right-of-way].)

We are unpersuaded the extrinsic evidence cited by the heirs supports their position. In an 1896 deed between the RLC and Duncan Blanton, the description of the property conveyed includes a portion of the strip previously deeded to the railway. On this basis, the heirs argue the RLC considered it still retained the fee to the right-of-way. Neither the record nor logic sustains this conclusion. It would be unreasonable to find the RLC intended to retain full title to a narrow strip of land, which it then bisected by conveying a small portion in fee to Duncan Blanton but none to any others, not even the RLC shareholders in partition. More significantly, the Blanton deed itself expressly "reserv[es] therefrom 100 feet in width right of way of [the railway]."

---

[13]Notably in this regard, the conveyance did not result from condemnation proceedings in which the railway could only have acquired an easement. (See *Highland Realty Co.* v. *City of San Rafael, supra,* 46 Cal.2d 669; *City of Oakland* v. *Schenck, supra,* 197 Cal. at p. 466; former Code Civ. Proc., §§ 1238, 1239, subd. 2.)

[14]Although indirect evidence for our purposes, a 1901 agreement by the RLC to convey fee title to one John Merrill substantiates that it contemplated complete divestiture of its entire holding. That agreement covered in part sections 24 and 25 of the RLC's original tract, over which the railway's right-of-way passed. Relevant to our inquiry, it stated the conveyance "is intended to include . . . all lands owned" by the RLC in those sections.

The heirs also rely on expert testimony that the partition map did not include acreage or an appraisal value for the right-of-way in parcels transferred to the shareholders. This omission is hardly conclusive of the RLC's interest. At best, it indicates the property was not part of the distribution proceedings because some other party owned it; but that fact does not assist in identifying the other owner. To the extent this consideration has any relevance to our inquiry, it suggests a contrary conclusion to that drawn by the heirs. Since the RLC was in the process of partitioning and distributing its remaining holdings to the shareholders, it would be illogical to retain any interest, much less the fee to a narrow strip of meandering property subject to an easement not likely to be abandoned by the railway in the foreseeable future. This evidence is also consistent with the exception of the railway's right-of-way in other partition documents.

Finally, the heirs contend Santa Fe should be bound by representations during property tax assessment litigation in 1954 and Interstate Commerce Commission abandonment hearings in 1982 that it only owned an easement. As the Court of Appeal in *Concord & Bay Point Land Co.* v. *City of Concord, supra,* 229 Cal.App.3d at page 296, observed, however, "a legal conclusion drawn [decades later] is not compelling evidence of what was intended by a grant made [at the turn of the century]" particularly since the original grantor took no part in the subsequent proceedings.

## IV

"I, John of Gaunt
Do give and do grant
To Sir John Burgoyne
And the heirs of his loin
Both Sutton and Potton
Till the world goes rotten."[15]

The document before us lacks not only such brevity but more importantly such clarity of intent. Fortunately, the grantor's actions speak to us more loudly over the decades than its words. The extrinsic evidence of subsequent transactions unambiguously reflects the RLC considered it had already conveyed to the railway full title to the right-of-way strip of land in 1888 and had not intended to transfer a lesser estate.

As should be clear from the discussion, we do not find the instant deed a paradigm conveyance but rather to the contrary, requiring us to ferret out the parties' intentions by less direct and less preferable considerations. In reaching our conclusion, we emphasize that the peculiar facts of this case dictate

[15]Anonymous.

the narrow, perhaps unique, basis of our holding. (Cf. *Machado* v. *Southern Pacific Transportation Co.*, *supra*, 233 Cal.App.3d at p. 353 ["the language of each instrument is sui generis"].) Further, we reaffirm the importance of careful drafting to insure property transactions consistent with the parties intended and desired result. The court's only function and concern should be to effectuate their manifest intent; for, as we have reiterated, that must control.

## DISPOSITION

The judgment of the Court of Appeal is reversed.

Lucas, C. J., Baxter, J., and George, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—The question before us is whether a deed conveying "the right of way for the construction, maintenance and operation of a Steam Railroad, upon over and along [a] tract and parcel of land . . . over and through the lands of grantors" transferred an easement or a defeasible fee. The majority correctly conclude that the foregoing language shows a transfer of an easement to the grantee. But their ultimate conclusion that the deed conveyed fee title is erroneous. They reach that conclusion because they are unduly absorbed in certain other language in the deed and incorrectly conclude that it renders the deed ambiguous and hence subject to consideration of extrinsic evidence.

## FACTS

On October 31, 1888, W. Dunn caused a deed to be recorded in the Los Angeles County land records:

"This Indenture made this 24th day of October 1888, by and between The Redondo Land Company, a corporation, and Charles Silent, a resident of the County of Los Angeles, State of California, parties of the First part, and

"The Redondo Beach Railway Company, a Corporation, party of the Second part.

"*Witnesseth*: That said parties of the First part for and in consideration of the sum of One Dollar to them in hand paid by said party of the Second part, the receipt of which is hereby acknowledged do by these presents remise, release and quit-claim unto said party of the second part the right of way for the construction, maintenance and operation of a Steam Railroad, upon over and along the following tract and parcel of land, situated, lying and being

in the County of Los Angeles, State of California, and described as follows, to-wit, Being a strip of land of the uniform width of 100 feet, 50 feet thereof being on each side of and parallel to the center line of location of The Redondo Division of the California Central Railway, over and through the lands of grantors, situated in the N.W. ¼ of Sec. 19, T. 3 S. R. 14 W. S.B.B.M.; The N.E. ¼ and S. ½ of Sec. 24; and the N. ½ and S.E. ¼ of Sec[.] 25 T. 3 S. R. 15 W. of S.B.B.M.; said center line being more fully described as follows, to-wit: [legal description], containing an area of 32.46 acres of land, more or less.

"Said parties of the First part reserve to themselves and except from the operation of this conveyance for a ware-house and ware-house storage purposes, a space of 200 feet in length, lying next adjacent to and midway between the ends of the side track now constructed upon said right of way and extending to the next adjacent boundary line of said right of way for the full length of said 200 feet.

"This Grant is made upon condition that the side-track now constructed upon said right of way shall be maintained and shall be used as a Station to receive and discharge freight; that such convenient crossings, not less than four, shall be made and maintained, with sufficient cattle guards, at such point on said right of way, as may be necessary for the full use and enjoyment of the lands adjoining said right of way, and so as to give access to and from the lands on either side thereof; that such culverts shall be constructed and maintained as may be necessary for the free passage of water across the same, and so located that the lands adjacent to said right of way will not be flooded on account of the roadbed of said railroad forming an embankment, and upon failure to comply with said conditions, or any of them, said right of way to revert to said parties of the first part and their successors in interest.

"To have and to hold all and singular the rights aforesaid unto said party of the second part and its assigns and successors forever, subject however to and upon the terms and conditions aforesaid.

"In Witness Whereof, the said The Redondo Land Company has caused these presents to be executed by its President and its Secretary and caused its seal to be hereto affixed, and said Silent has hereto set his hand and seal the day and year first above written."

"The Redondo Land Company.

"By, *D. McFarland*

"President.

"By, *Hugh W. Vail*

"Secretary.

*"Chas. Silent* [Seal]"

The Court of Appeal described the proceedings in this case: "The instant action was commenced on December 31, 1987, when real parties filed suit. Their fourth amended complaint alleged causes of action to quiet title, for inverse condemnation and ejectment and damages. Both the City and Santa Fe answered. [¶] The superior court trifurcated the issues of liability, heirship and damages. On December 23, 1992, the court issued its statement of decision on liability. It found that the right-of-way acquired by Santa Fe's predecessor via the 1888 deed was an easement; that Santa Fe's interest in the easement ceased upon its abandonment of the railway line; that the City's and Santa Fe's conduct with respect to [an agreement to sell the right of way] constituted a taking by inverse condemnation for which they were jointly liable; and real parties had no interest in that portion of the right of way extending into Hermosa Beach, such property having been conveyed in fee to Blanton Duncan by the [Redondo Land Company]."

The Court of Appeal further stated, "[b]oth the City and Santa Fe filed petitions for writ challenging the trial court's decision. . . ."

I

Interpretation of a deed ordinarily is a question of law that we undertake de novo. (*Faus* v. *City of Los Angeles* (1967) 67 Cal.2d 350, 360 [62 Cal.Rptr. 193, 431 P.2d 849].)

The trial court found that "[t]he 'right of way' conveyed to the Redondo Beach Railway Company in the 1888 deed constituted an easement." It was correct.

"When a contract is reduced to writing, the intention of the parties is to be ascertained *from the writing alone*, if possible . . . ." (Civ. Code, § 1639, italics added.) *"The language of a contract is to govern its interpretation*, if the language is clear and explicit, and does not involve an absurdity." (*Id.*, § 1638, italics added.) "The cardinal requirement in the construction of deeds and other contracts is that the intention of the parties *as gathered from the four corners of the instrument* must govern." (*Machado* v. *Southern*

*Pacific Transportation Co.* (1991) 233 Cal.App.3d 347, 352 [284 Cal.Rptr. 560], italics added.) The foregoing rules are crucially important in the case of a recorded deed, for it provides public notice that successors in interest and innocent third parties may need to rely on for centuries. For that reason, whatever the parties may have intended, it is the language used in the resulting conveyance that must govern "if possible . . . ." (Civ. Code, § 1639.)

Hence, if the language of a conveyance unambiguously states the nature of the interest conveyed, there is no need to turn to extrinsic evidence bearing on that question. (*Baker* v. *Ramirez* (1987) 190 Cal.App.3d 1123, 1132 [235 Cal.Rptr. 857]; cf. *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373].) In fact it is highly undesirable to do so, because considering extrinsic evidence undermines the public's ability to rely on recorded notice of interests in land. Considering such evidence must be reserved for those instances in which "application of *pertinent rules of interpretation* to the face of the instrument leaves it *genuinely uncertain* which of two or more meanings is the proper meaning." (*Siegel* v. *Hackler* (1957) 181 Kan. 316, 319 [310 P.2d 914, 917], italics added.)

It has been said that "[w]ords . . . do not have absolute and constant referents" (*Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co., supra,* 69 Cal.2d at p. 38), but that is probably least true of the venerable terms of art describing interests in land. So although we must read the deed with an understanding of what its terms meant to drafters of railroad conveyances in 1888 (see *Smiley* v. *Citibank* (1995) 11 Cal.4th 138, 150, 151-153 [44 Cal.Rptr.2d 441, 900 P.2d 690] [definition of term must be inferred from context of statute's enactment in 1864]), we do so aware of the ancient pedigree of such terms as "right of way."

When we adhere to the foregoing principles, it becomes plain on independent review that the 1888 deed conveyed an easement and that there is no need to consider extrinsic evidence to divine the meaning of the words therein.

The granting clause conveys an interest in land consisting of a "right of way" to build a railroad. For $1 the grantors did "remise, release and quit-claim . . . the right of way for the construction, maintenance and operation of a Steam Railroad, upon over and along [a] tract and parcel of land . . . over and through the lands of grantors . . . ."

The foregoing language gave the railroad a servitude on land (Civ. Code, § 801) rather than an estate in it (*id.,* § 761). It was universally understood at

the time that such language conveyed only a right of way—i.e., an easement (*id.*, § 801, subd. 4). Indeed, a railroad law treatise relied on similar uses of language in advising practitioners on how to write a deed conveying an easement as opposed to fee simple title. When drafting an "Ordinary Deed to Railroad Company, passing a Fee Simple" (Baldwin, American Railroad Law (1904) p. 609), the text should "grant, bargain, sell and confirm unto the . . . Railroad . . . a certain parcel of land . . . described as follows . . . ." (*Id.* at p. 610.) To instead convey "only a Right of Way" (*ibid.*), the drafter is instructed to "[i]nsert in [the previously quoted text] in the granting clause, just before the description of the land conveyed, 'a right of way for railroad purposes over and upon,' and add to the *habendum* clause, 'for use only for railroad purposes.' " (*Ibid.*)

As the majority's analysis may fairly be read to acknowledge, a conveyance of a "right of way" "over" the grantor's land is a conveyance of an easement. This must be so, because the language shows that the land company conveyed an appurtenant use to the railroad. (Civ. Code, § 801 ["right[s]-of-way" "may be attached to other land as incidents or appurtenances, and are then called easements"]; see *Corea* v. *Higuera* (1908) 153 Cal. 451, 454-456 [95 P. 882].) After all, "land cannot be appurtenant to land"; only a "thing incorporeal" can be. (*Harris* v. *Elliott* (1836) 35 U.S. (10 Pet.) 25, 54 [9 L.Ed. 333, 344].) Hence the undeviating body of California law explaining that language of this type conveys an easement. (*Highland Realty Co.* v. *City of San Rafael* (1956) 46 Cal.2d 669, 676 [298 P.2d 15] (*Highland*) [grant of " 'right of way for the construction and use of said Railroad upon, over, and along a strip of land . . . described as follows . . .' " "conveyed . . . an easement, and nothing more"]; *Ocean Shore Railroad Co.* v. *Doelger* (1954) 127 Cal.App.2d 392, 394, 399-400 [274 P.2d 23] ["plaintiff was granted 'a surface right of way, for railroad purposes only, over' [a] 60-foot strip . . . upon certain conditions therein expressed"; easement conveyed]; *Moakley* v. *Los Angeles Pacific Ry. Co.* (1934) 139 Cal.App. 421, 422, 425 [34 P.2d 218] [deed conveyed " 'a right of way for railroad purposes over and along all that certain lot, piece or parcel of land' "; easement conveyed].)

This was the universal rule when the deed was recorded, although a variety of prepositional language was used. (*Atlantic & P. R. Co.* v. *Lesueur* (1888) 2 Ariz. 428 [19 P. 157, 158, 160] [grant of " 'the right of way through the public lands . . . for the construction of a railroad and telegraph' " conveyed "a grant of an easement as defined by the law" and "was not a grant of the fee"]; *Cincinnati, I., St. L. & C. Ry. Co.* v. *Geisel* (1889) 119 Ind. 77 [21 N.E. 470] [deed to " 'release, relinquish, and forever quitclaim to the . . . Railroad . . . the right of way for so much of said railroad, being eighty

feet wide, as may pass through the following described piece, parcel, or lot of land' " conveyed an easement]; *Illinois Cent. R. Co.* v. *Houghton* (1888) 126 Ill. 233 [18 N.E. 301, 302] [dictum] [conveying, " 'for the purpose of constructing, maintaining and operating thereon a . . . railroad . . . , the right of way over and through said tract' " granted an easement]; *Brown* v. *Young* (1886) 69 Iowa 625 [29 N.W. 941].) In *East Alabama Railroad Co.* v. *Doe* (1885) 114 U.S. 340, 342-343, 350 [29 L.Ed. 136, 137, 139-140, 5 S.Ct. 869], decided some three and one-half years before the indenture at bench was recorded, the court held that an 1860 indenture conveying " 'unto the said railroad company . . . the right of way over which to pass at all times . . . and particularly for the purpose of running . . . thereon a railroad' " conveyed "merely a right of way for a railroad"; "[n]o fee in the land was conveyed"; "[w]hat [the railway] acquired was merely an easement in the land . . . ."

The rule did not appear to change in the decades following the recording of the deed. (*Incorporated Town of Ackley* v. *Central States E. Co.* (1928) 206 Iowa 533 [220 N.W. 315, 317] [deed operating to " 'release to the said [railway] company the right of way through any lands I own' "; easement conveyed]; *Branch* v. *Central Trust Co.* (1926) 320 Ill. 432 [151 N.E. 284, 287] ["[t]he grant to a railroad company of a right of way over, through, and upon land described does not convey the fee to any part of the land described . . ."]; *Walker* v. *Illinois Cent. R. Co.* (1905) 215 Ill. 610 [74 N.E. 812, 813-814] [deed to " 'grant, bargain, sell . . . for the purpose of constructing, maintaining, and operating thereon a single or double track railroad . . . the right of way for the same over and through the following tracts or parcels of land . . . [description]' "; easement conveyed].)

The 1888 deed's unvarying and repeated use of the term "right of way" without reference to a conveyance of "land" or "title" is simply fatal to any conclusion that fee title was conveyed. "The general principle that a deed to a railroad company which conveys a 'right' rather than a strip, piece, parcel, or tract of 'land' (usually a right of way but occasionally the right or privilege of constructing, operating, or maintaining a railroad) must be construed as conveying an easement rather than a fee has been applied or recognized in numerous decisions." (Annot., Deed to Railroad Company as Conveying Fee or Easement (1941) 132 A.L.R. 142, 172-173.) "All authorities agree that the grant of a 'right of way' confers only an easement in the land." (*Right of Way Oil Co.* v. *Gladys City Oil, Gas & Mfg. Co.* (1913) 106 Tex. 94 [157 S.W. 737, 739]; see also Annot., Deed to Railroad Company Covering Right of Way, but Otherwise Appearing to Be Absolute Conveyance, as Conveying Fee or Easement (1933) 84 A.L.R. 271.)

It is different, of course, when "land" or a "parcel" is conveyed. (*Machado* v. *Southern Pacific Transportation Co.*, *supra*, 233 Cal.App.3d 347, 351, 361

[deed granted a " 'certain strip or parcel of land for a right of way for a standard gauge railroad' " and habendum clause referred to " 'premises' "; fee title conveyed]; *Concord & Bay Point Land Co.* v. *City of Concord* (1991) 229 Cal.App.3d 289, 293, 295 [280 Cal.Rptr. 623] [deed conveyed " 'certain property' " " 'more particularly described as' " " 'parcel three[,]' " a " 'strip of land sixty (60) feet in width' "; "the deed clearly grants an estate in land"]; *Faus* v. *Pacific Electric Ry. Co.* (1956) 146 Cal.App.2d 370, 380 [303 P.2d 814], disapproved on another point in *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 866, fn. 2 [44 Cal.Rptr. 767, 402 P.2d 839] [deeds "*not* of a right of way 'upon, over, and along a strip of land[]' . . . . were grants of the entire land for the purpose of use as a way for an electric railroad" (italics added)]; *Moakley* v. *Blog* (1928) 90 Cal.App. 96, 99 [265 P. 548] [deed conveying to railroad " 'all that certain lot, piece or parcel of land . . . bounded and particularly described as follows' "; fee title conveyed].) But here, in sharp contrast, "[t]he deed literally, from beginning to end, provides for a 'right-of-way'. These words appear [eight] times therein." (*Rock Island, A. & L. R. Co.* v. *Gournay* (1943) 205 La. 125 [17 So.2d 8, 11], rehg. den. (1944) 205 La. 164 [17 So.2d 21] [holding easement conveyed].)

Finally, the provision of the 1888 deed that the right-of-way was to be used for "a Steam Railroad" supports the conclusion that it transferred an easement. (*Highland, supra,* 46 Cal.2d 669, 676 [ " 'for the construction and use of said Railroad' "]; *Keokuk County* v. *Reinier* (1939) 227 Iowa 499 [288 N.W. 676, 677, 678] [grant " 'for all purposes incident and necessary to the construction and operation of a railroad' " conveyed right-of-way rather than fee]; *Right of Way Oil Co.* v. *Gladys City Oil, Gas & Mfg. Co., supra,* 157 S.W. 737, 738 [" ' "for the purpose of constructing, operating and maintaining its railroad" ' "]; *Fitchburg R. Co.* v. *Frost* (1888) 147 Mass. 118 [16 N.E. 773, 775] [" 'for railroad purposes only' "; easement conveyed]; see also Baldwin, American Railroad Law, *op. cit. supra,* p. 610 [drafter should "add to the *habendum* clause, 'for use only for railroad purposes' "].) Naturally, language of limitation can also reveal that a defeasible fee was conveyed. (*Epworth Assembly* v. *Ludington & N. Ry.* (1926) 236 Mich. 565 [211 N.W. 99, 102] [deeds for " 'railroad purposes' "; but "[i]n neither deed is the land conveyed for a right of way"].) Such is not the case here, however: a "right of way" was conveyed "for . . . a Steam Railroad . . . ."

## II

So far I believe that the majority and I largely agree. They lead themselves astray only when they begin to place undue emphasis on certain other language in the deed.

First, they conclude that because the term "quit-claim" appears in the indenture, a rule of construction supports the view that fee title was conveyed. What they fail to understand, however, is that any interest in land that

can be conveyed by deed is conveyable by quitclaim deed. This includes an easement. (*Westlake* v. *Silva* (1942) 49 Cal.App.2d 476, 478-479 [121 P.2d 872].) It even includes a reversionary interest such as a right to recover possession on breach of condition subsequent. (*Thornton* v. *Middletown E. Corp.* (1937) 21 Cal.App.2d 707, 708-710 [70 P.2d 234]; see Civ. Code, § 1046.)

It is true that the grantors in *Westlake* held no more than an easement. But cases construing quitclaim deeds by the apparent or stated holder of fee title as conveying an easement to a railroad are many. (*Estate of Rockafellow* v. *Lihs* (Iowa Ct.App. 1992) 494 N.W.2d 734, 735-736; *Veach* v. *Culp* (1979) 92 Wn.2d 570 [599 P.2d 526, 527-528]; *Vandalia R. Co.* v. *Topping* (1916) 62 Ind.App. 657 [113 N.E. 421, 422-424] [construing statute]; *Cincinnati, H. & D. Ry. Co.* v. *Wachter* (1904) 70 Ohio St. 113 [70 N.E. 974, 975]; *Cincinnati, I., St. L. & C. Ry. Co.* v. *Geisel, supra,* 21 N.E. 470.) A somewhat standardized form appears to have been used for such conveyances.

Indeed, as plaintiffs explain with regard to defendants herein, the majority simply "confuse the *form* of the conveyance with the *interest* being conveyed." The term "quitclaim" has nothing to do with the latter. It has been stated that "[a] quitclaim deed transfers whatever present right or interest the grantor has in the property." (*Westlake* v. *Silva, supra,* 49 Cal.App.2d at p. 478.) But the term "whatever," with its connotation of uncertainty, is the key to understanding such declarations. If the vendor simply wishes to sell an interest in land "as is," i.e., without right of possession by the grantee, warranty of title, or other covenants implied in certain grant deeds, a quitclaim deed is the proper instrument. (See 2 Miller & Starr, Current Law of Cal. Real Estate (2d ed. 1989) § 6:5, pp. 493-494; *id.,* § 6:12, p. 504.) The grantor may not even know what interest he or she has (see 2 Miller & Starr, *op. cit. supra,* § 6:12, p. 504), but may wish to divest himself or herself of it in exchange for some benefit or to avoid some detriment—e.g., in exchange for a nearby railroad, or to avoid being a defendant in a quiet title suit—without warranting title or making other assurances. If so, then a quitclaim deed is the device used. If "it has been often decided by this court that a quitclaim deed conveys the absolute fee-simple title if the party executing it had such title" (*Spaulding* v. *Bradley* (1889) 79 Cal. 449, 456 [22 P. 47]), that is likely so because the grantor wished to eliminate his or her entire estate or interest, whatever it might be, without "mak[ing any] assurance to the grantee that he or she actually has good title to, or even any interest at all in, the property . . . ." (6A Powell on Real Property (1995 ed.) ¶ 897[1] [b], p. 81A-29.) Here, in notable contrast, the face of the deed shows unequivocally that only a right-of-way was conveyed.

Second, the majority make too much of the use of "land" in the deed. That instrument describes the right-of-way as "a strip of land of the uniform width

of 100 feet" and as "containing an area of 32.46 acres of land, more or less." When the deed is read as a whole, it is clear that these definitional references are inconsequential. The right-of-way *is* a strip of land—it does not float in the air. The fact that an easement that consists of a burden on land is described in units of land measure does not transform it into a fee, as an appellate decision of this state has implicitly recognized. In *Moakley* v. *Los Angeles Pacific Ry. Co.*, *supra*, 139 Cal.App. 421, a right-of-way consisting of " 'a strip of land 35 feet in width . . . containing 0.67 of an acre of land' " (*id.* at p. 422) was conveyed. The conveyance also provided that " 'said right of way and land shall immediately . . . revert' " (*id.* at p. 423) to the grantors and their heirs under certain conditions. *Moakley* found only the last-quoted reference to "land" controversial on the question whether fee title or an easement was conveyed (*id.* at p. 423), and correctly concluded that an easement was created (*id.* at p. 425).

Given the wealth of law explaining the meaning of the deed's repeated references to a right-of-way and its language of appurtenance, it cannot be said that "application of pertinent rules of interpretation to the face of the instrument leaves it *genuinely uncertain* which of two or more meanings is the proper meaning." (*Siegel* v. *Hackler*, *supra*, 310 P.2d 914, 917, italics added.) Neither the quitclaim nature of the conveyance nor its mentions of "land" create so great an ambiguity.

Other observations made by the majority require only brief comment.

The majority observe that the term "right of way" may refer to land itself rather than the use of land. That is true (*Machado* v. *Southern Pacific Transportation Co.*, *supra*, 233 Cal.App.3d 347, 354), but it is beside the point. In the 1888 deed no land was conveyed, but only a right-of-way for a railroad. That is the crucial distinction. "There is a vast difference between a grant for purposes of 'right of way' for a road and a grant of land 'to be used for a road.' The latter grant may be entirely consistent with the conveyance of a fee-simple title . . . , but the grant of land as a right of way recognizes nothing but an easement." (*Parks* v. *Gates* (1921) 186 Cal. 151, 155 [199 P. 40].)

The majority further note that the right-of-way is given a precise legal description and its acreage is also described. Relying on *Moakley* v. *Blog*, *supra*, 90 Cal.App. 96, they conclude that when a deed includes a legal description of this type, it is evidence that a fee was conveyed. But *Moakley* is properly read as deciding that a fee was conveyed because the deed recited that the grantors conveyed to the railroad " 'all that certain lot, piece or parcel of land . . . bounded and particularly described as follows . . . .' "

(*Ibid.*) The salient observation to be made about the 1888 deed's legal description and acreage of the right-of-way is that it describes not " 'that certain lot, piece or parcel of land' " (*ibid.*), but instead the land "upon over and along" which the right-of-way extends. It appears not to have been unusual to describe the land across which an railroad easement extends, and that is what occurred here. (*Moakley* v. *Los Angeles Pacific Ry. Co., supra,* 139 Cal.App. 421, 422, 425 [deed conveyed " 'a right of way for railroad purposes over and along all that certain lot, piece or parcel of land . . . bounded and particularly described as follows, to wit: a strip of land 35 feet in width the center line of which is described as follows: . . . containing 0.67 of an acre of land' "; easement created]; *El Dorado & Wessen Railway Company* v. *Smith* (1961) 233 Ark. 298 [344 S.W.2d 343, 344, 345] [conveying " 'strip of land . . . over and upon the following described land [five 40-acre tracts are described]' " created easement]; *Rock Island, A. & L. R. Co.* v. *Gournay, supra,* 17 So.2d 8, 10 [conveying " 'strip of land . . . over and upon the following described land . . . . [¶] [legal description] . . . said right of way hereby conveyed containing 3.81 acres' " created easement (italics deleted)]; *Sherman* v. *Petroleum Exploration* (Ky.Ct.App. 1939) 280 Ky. 105 [132 S.W.2d 768, 770, 772, 132 A.L.R. 137] [conveying " 'strip, tract or parcel of land for railroad right of way' " " 'containing [2.2] acres, more or less' " created easement].)

The majority urge that certain language of reservation in the 1888 deed supports the view that fee title was conveyed. Their discussion, however, is incomplete. The deed both "reserve[s]" and "except[s] from the operation of this conveyance" "a space" "for a ware-house and ware-house storage purposes. . . ." "Exception" and "reservation" mean entirely different things, "though the terms are often used promiscuously" (*Lange* v. *Waters* (1909) 156 Cal. 142, 146 [103 P. 889]): an exception limits the extent of the interest or estate conveyed, keeping the whole prior estate or interest in the grantor, whereas a reservation creates a new, lesser interest in a grantor conveying fee title. (See 5 Miller & Starr, *op. cit. supra,* Easements § 15:18, pp. 444-445; see also *Golden West Baseball Co.* v. *City of Anaheim* (1994) 25 Cal.App.4th 11, 38 [31 Cal.Rptr.2d 378].) "An exception is always of some part of the estate not granted at all. A reservation is always of something taken back out of that which is clearly granted." (*Sears* v. *Ackerman* (1903) 138 Cal. 583, 586 [72 P. 171].) Thus it was inartful drafting to both "reserve" and "except" some land from the right of way. It is practical, however, to conclude that the parties intended to except from the right-of-way land for a warehouse, so that the land company would keep fee title to it unencumbered by any servitude. In other words, they merely limited the size of the easement to a very slight extent.

The majority also suggest that the deed's reverter clause is evidence that a fee was conveyed. That is implausible.

An easement may be conveyed subject to conditions subsequent and extinguished if they occur. (*Lincoln* v. *Narom Development Co.* (1970) 10 Cal.App.3d 619, 622-623 [89 Cal.Rptr. 128]; *Dotson* v. *Wolfe* (Fla.Dist.Ct.App. 1980) 391 So.2d 757, 759; *University City* v. *Chicago, R. I. & P. Ry. Co.* (1941) 347 Mo. 814 [149 S.W.2d 321, 326].) The deed contains three conditions requiring the right-of-way to be maintained so as to avoid diminishing the value of adjoining land. By law the easement could be extinguished only under certain general conditions. (Civ. Code, § 811.) Although the statute vaguely declares that one such condition is "the performance of any act upon either tenement, by the owner of the servitude, or with his assent, which is incompatible with its nature or exercise" (*id.*, § 811, subd. 3), the land company undoubtedly wished to require that specific conditions be met so that the right-of-way would not damage the value of adjacent land, and hence the deed provides that failing to provide proper infrastructure or maintenance would terminate the railroad's interest.

"Of course the word 'revert' in its technical sense as dealing exclusively with titles should not be used in conjunction with an easement." (*Brown* v. *Weare* (1941) 348 Mo. 135 [152 S.W.2d 649, 655, 136 A.L.R. 286].) For "an easement . . . abandoned by nonuse or use outside its limitations does not 'revert' to the grantor, it is simply extinguished." (*Concord & Bay Point Land Co.* v. *City of Concord, supra,* 229 Cal.App.3d 289, 295.) But the inaccurate use of "revert" in a railway conveyance appears to be widespread. (See *Brown* v. *Weare, supra,* 152 S.W.2d at p. 655.) Hence, a deed conveying a right-of-way rather than title to land may have a reverter clause, and though the term is misused, yet an easement is conveyed. (*Moakley* v. *Los Angeles Pacific Ry. Co., supra,* 139 Cal.App. 421, 422, 423, 425 [deed conveyed " 'right of way for railroad purposes' " and provided that on abandonment " 'said right of way and land shall immediately thereafter revert to said first parties' "; easement conveyed].) In *Rosecrans* v. *Pacific Elec. Ry. Co.* (1943) 21 Cal.2d 602 [134 P.2d 245], the deed conveyed a "right of way for a railroad across the real property therein described" (*id.* at p. 603)—i.e., an easement—and provided that " 'upon . . . breach [of specified conditions] the right of way hereby granted shall revert to first party his heirs or assigns, and upon such breach, first party, his heirs or assigns shall have the right to enter upon said right of way and take possession thereof.[']" (*Id.* at p. 604.)

The majority mention that the deed nowhere uses the term "easement." It would, however, have been imprecise to do so. In addition to "[t]he right-of-way" (Civ. Code, § 801, subd. 4), many other types of appurtenant easements have been recognized in our Civil Code since 1872. These include the "right of pasture" (*id.,* subd. 1), the "right of taking water, wood,

minerals, and other things" (*id.*, subd. 5), and even the "right of a seat in church" (*id.*, subd. 16). The majority hint that "easement" and "right of way" may be equivalent, but they are not—"right of way" is the more specific term, and to utilize it was better drafting.

In addition to the legal principles explicated above, it would not have been practical to convey fee title to the railroad. The parties' exhibits suggest that the strip was perhaps two or three miles long. A long strip 100 feet wide meandering through others' adjacent land in what was remote territory (*Manhattan Beach* v. *Cortelyou* (1938) 10 Cal.2d 653, 664 [76 P.2d 483]) would not have been more valuable if held in fee simple rather than used for a right-of-way: it was landlocked and to be marketable as subdivided parcels would have required, at a minimum, the creation of many ways of necessity. "[T]he shape of the tract, a 100-foot strip, is peculiarly suited to railway purposes and to little else." (*El Dorado & Wessen Railway Company* v. *Smith, supra*, 344 S.W.2d 343, 345.) The size and shape of the right-of-way supports the conclusion that an easement was conveyed.

### III

*Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co., supra*, 69 Cal.2d 33, held that extrinsic evidence must be considered to interpret the term "property" in a contract (*id.* at p. 36) notwithstanding any claim that "the contract had a plain meaning" (*ibid.*). From that holding, the case drew broad conclusions regarding the propriety of considering, "at least [as] a preliminary" matter (*id.* at p. 39), extrinsic evidence when presented with a written transaction that appears to contain unambiguous terms.

Such aspects of *Pacific Gas & E. Co.* have been criticized as "cast[ing] a long shadow of uncertainty over all transactions negotiated and executed under the law of California." (*Trident Center* v. *Connecticut General Life Ins.* (9th Cir. 1988) 847 F.2d 564, 569.) In the same vein, in a dissent joined by two other justices, I have criticized the "emasculation of the parol evidence rule" in *Pacific Gas & E. Co.* (*Delta Dynamics, Inc.* v. *Arioto* (1968) 69 Cal.2d 525, 531 [72 Cal.Rptr. 785, 446 P.2d 785] (dis. opn. of Mosk, J.).) "The problem," I stated, "is that which devolves upon members of the bar who are commissioned by clients to prepare a written instrument able to withstand future assaults. . . . The written word, heretofore deemed immutable, is now at all times subject to alteration by self-serving recitals based upon fading memories of antecedent events. This, I submit, is a serious impediment to the certainty required in commercial transactions." (*Id.* at p. 532.)

Nowhere are the foregoing criticisms more telling than in the case of a deed giving notice to the world of the boundaries and nature of ownership of

a plot of land. As stated, a deed may need to provide such notice for centuries, and very precise terminology and syntax have been devised for that purpose. Hence, a conveyance of a " 'right of way' " (*Highland, supra,* 46 Cal.2d 669, 676) transfers an entirely different interest in land from a conveyance of a " 'certain strip or parcel of land for a right of way' " (*Machado* v. *Southern Pacific Transportation Co., supra,* 233 Cal.App.3d 347, 351). To question the meaning of such precisely differentiated terminology on the basis of dubious extrinsic evidence is to undermine the reliability of notice on which the public depends.

Fortunately, *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co., supra,* 69 Cal.2d 33, is distinguishable: it did not consider a recorded instrument that, using venerable terms of art, announced interests in land to the world. We need not rely on *Pacific Gas & E. Co.* in a case such as this. Instead we must firmly adhere to the rule that if the language of a conveyance unambiguously states the nature of the interest conveyed, there is no need to turn to extrinsic evidence bearing on that question. (*Baker* v. *Ramirez, supra,* 190 Cal.App.3d 1123, 1132.)

The majority's reliance on extrinsic evidence for their conclusion that the 1888 deed conveyed fee title does, however, require a response. It becomes apparent that the extrinsic evidence sheds scant light on the nature of the interest conveyed.

It has been held that when there is " 'no conflict' in such extrinsic evidence as has been introduced, 'we must make an independent determination of the meaning' of a legal instrument." (*Faus* v. *City of Los Angeles, supra,* 67 Cal.2d 350, 360.) The rule could be more precisely stated. If the nonconflicting extrinsic evidence consists solely of other written instruments such as contracts or deeds, we interpret their meaning and their effect on the 1888 deed de novo. If, on the other hand, the extrinsic evidence consists primarily of facts adduced through testimony at trial, we must defer to trial court findings that are based on such evidence, even if there appears to be no conflict, because the court is better positioned than are we to observe a witness's demeanor and discern his or her credibility. Testimony can be uncontroverted and yet be presented in a fashion that is unpersuasive for reasons not evident on a written record.

Turning to the extrinsic evidence presented:

The trial court found that "[e]xtrinsic evidence also supports, but is not necessary to, such construction [of the 1888 deed as conveying an easement]. Such extrinsic evidence includes: (a) the fact that in other deeds the

Redondo Land Company clearly transferred fee interests but did not utilize similar language in the 1888 deed; [and] (b) the fact that the Redondo Land Company purported to convey property which included a portion of the subject right-of-way in the metes and bounds description and in the calculated acreage in a deed to Duncan . . . ."

If extrinsic evidence were necessary to our conclusion, we would review the instruments transferring fee interests de novo. The court was apparently referring to deeds conveying property to Blanton Duncan. Conveyances to him evidently occurred in 1895 and 1896. The record contains only transcriptions of the purported deeds and not the originals. In those transcriptions the Redondo Land Company conveys to him, respectively, "all those certain lots, pieces or parcels of land" and "all that certain lot, piece or parcel of land . . . ." There does not appear to be a stipulation that these transcriptions faithfully reproduced the originals. On independent review, however, if we were to agree that the transcriptions are proper evidence and were to construe their language, we should agree with the trial court that the language was materially different and illustrated that some years later the drafter knew how to convey a fee rather than an easement. (See *Moakley* v. *Blog, supra,* 90 Cal.App. 96, 99.)

The trial court's finding that the Redondo Land Company conveyed part of the right-of-way in a deed to Duncan should be reviewed for substantial evidence, for it is based on surveyors' expert testimony at trial. Substantial evidence in the record supports that finding: the surveyors testified that the legal description of the conveyance traversed the right-of-way.

The trial court found, "[w]ith respect to defendants' arguments based on extrinsic evidence, the unrecorded indenture of 1897 . . . did not demonstrate a contrary intent in 1888 to convey more than an easement. Nor did it constitute a later conveyance to the railroad of an interest greater than an easement. [¶] . . . The quiet title judgment of 1901 . . . and the pleadings in the various consolidated quiet title actions . . . do not demonstrate a contrary intent in 1888 to convey more than an easement. Nor do these exhibits demonstrate that the railroad ever obtained more than an easement interest."

On independent review, it is evident that the trial court ruled correctly in part and erroneously in part. The majority observe that the unrecorded 1897 indenture modifying the 1888 deed's infrastructure and maintenance conditions declared that the deed "shall remain a grant *as therein expressed* . . . ." (Italics added.) What the deed expressed, however, was a grant of an easement. In fact, the 1897 indenture referred to "the right of way in said [1888] deed granted . . . ." The 1897 indenture supports the view that an easement was conveyed.

On the other hand, an amended complaint in a 1901 action to quiet title to land owned by plaintiff Redondo Land Company excepted from the suit the land underlying the conveyance to the railroad under the 1888 deed. Defendants contend that if the company still held fee title to the land, it would have included it in the suit. On independent review, we may concede that this exception provides some extrinsic evidence for that view.

The parties also discuss what is purported to be a judgment in that action. However, their exhibits contain no copy of an original document, but only a typed transcription. In the absence of a stipulation, we should not consider it to be evidence. Nor should we conclude that a memorandum of agreement regarding interests in land, apparently by the Redondo Land Company's shareholders, shows that a fee was conveyed in 1888. To the extent that the transcription of that memorandum contained in the exhibits is competent evidence of anything, it excepted "those certain parcels of land heretofore granted by the Redondo Land Company to Blanton Duncan" and "that certain right of way heretofore granted" to the railroad. That language, differentiating between "land" and the "right of way," does not show that the 1888 deed conveyed fee title. It suggests the contrary.

The foregoing items, to the extent they are competent evidence at all, are, as the Court of Appeal effectively concluded, trifling: they shed little light on the meaning of the 1888 deed. Perhaps sensing so, defendants emphasize a 1903 decree of dissolution of the Redondo Land Company. The decree states in part, "And it appearing further that all of the property of said corporation has been disposed of and that all of the business of said corporation has come to an end [¶] Now therefore it is ordered and adjudged that the said corporation, The Redondo Land Company, be, and the same is hereby dissolved, and its corporate existence ended . . . ." (Capitalization altered.)

The Court of Appeal agreed to take judicial notice of the contents of the decree, but concluded that it was of "marginal" significance. Defendants insist that the 1903 decree shows not only that fee title was conveyed in 1888, but also that even if an easement was conveyed in 1888, the decree means that plaintiffs cannot now claim any title to the land.

This claim fails because it relies on evidence that the parties stipulated at trial would not be introduced. Apparently it came to the parties' attention after trial was concluded and while appeal was pending. However, at the beginning of trial, the parties bound themselves as to the corpus of evidence to be considered in this case by stipulating that "by the time each party rests in this case the parties will have offered into evidence all documents in the

chain of title to the subject property or adjacent land that are pertinent to the decision of this case. [¶] The parties are unaware of any other documents. The court need not consider the possible existence of other documents. Apart from the documents offered there are no others that the parties are aware of that bear on this case or are necessary for the court to consider in arriving at a decision on this case."

A fair reading of this stipulation is that the parties agreed to be bound by the documentary evidence presented at trial. Having entered into the stipulation, defendants may not present new evidence now. (See *Estate of Cooper* (1970) 11 Cal.App.3d 1114, 1119, 1122-1124 [90 Cal.Rptr. 283].) The majority grant the request for judicial notice, but it should be denied.

As the Court of Appeal concluded, "construction of the deed does not require resort to extrinsic evidence." The material that exists, if competent or admissible evidence at all, "either does not support [defendants'] interpretation or is too attenuated to be of much relevance."

IV

Defendant Atchison, Topeka and Santa Fe Railway Company (Santa Fe) contends that the Court of Appeal erred in affirming the trial court's judgment that it was liable along with defendant city of Manhattan Beach (the city) in inverse condemnation for taking the land underlying the easement. Insofar as it concerns this point, Santa Fe's contention that the Court of Appeal's judgment should be reversed has merit.

In 1986 and 1989, in recorded documents creating and then modifying a "Park Acquisition Agreement," the city and Santa Fe agreed essentially as follows: Santa Fe wanted to develop 2.12 acres of land lying at one end of its right-of-way for a commercial project, and the city wanted to acquire the right-of-way for a recreational trail. Santa Fe agreed to convey to the city its interest in the land over which the right-of-way ran within the city, except for the 2.12-acre parcel. The city agreed to pay $4.2 million, to give Santa Fe title to certain parcels, and to rezone the 2.12-acre parcel for commercial use. Santa Fe agreed to "indemnify . . . the city . . . from any claim . . . arising out of alleged defective title to any portion or parcel of railroad right-of-way sold . . . under this agreement" (capitalization altered) up to the sum of (1) the $4.2 million purchase price of the right-of-way and (2) the value of the parcels to which the city was giving it title. The parties agreed that if any claim of disputed title over the right-of-way was presented to the city, Santa Fe could begin, at its own expense, eminent domain proceedings in the city's name to acquire the claimant's interest. Finally, the city agreed to rezone the right-of-way for "Open Space Recreation."

At trial, virtually no evidence regarding the acquisition agreement was introduced. Nor was there much discussion of the point at closing argument. Nevertheless, in the trial court's statement of decision it determined, in essence, that the acquisition agreement showed that Santa Fe actively participated in taking plaintiffs' land and therefore it was liable under the authority of *Breidert* v. *Southern Pac. Co.* (1964) 61 Cal.2d 659 [39 Cal.Rptr. 903, 394 P.2d 719].

Because the trial court based its determination largely (and probably entirely, given the dearth of evidence presented at trial) on the acquisition agreement, it decided a question that was either a question of law—the interpretation of a written instrument (*Faus* v. *City of Los Angeles, supra,* 67 Cal.2d 350, 360)—or was a mixed question of law and fact that was primarily legal. Its ruling should be subjected to independent review.

Under that standard, it appears that the trial court's interpretation of the agreement was erroneous. The acquisition agreement's provisions are designed to facilitate the transfer of the right-of-way from Santa Fe, as private seller, to the city as buyer, in exchange for which the former would be paid, given other land, and allowed to develop its 2.12-acre parcel. Santa Fe appears to be correct that nothing in the agreement shows that it took the land underlying the right-of-way for public use: if any entity did so, it was the city. Contrary to the trial court's and the Court of Appeal's reasoning, the acquisition agreement created no joint project to develop the right-of-way: Santa Fe wanted to be rid of it. Although the agreement declares that Santa Fe "seeks to transform undeveloped property in [the city] into developed property in accordance with the plan for the Project," elsewhere the "Project" was defined as "all Project areas east of Sepulveda Boulevard"—i.e., the 2.12-acre parcel.

Article I, section 19, of the California Constitution provides: "Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner. The Legislature may provide for possession by the condemnor following commencement of eminent domain proceedings upon deposit in court and prompt release to the owner of money determined by the court to be the probable amount of just compensation." As Santa Fe persuasively argues, a private seller cannot be liable in inverse condemnation merely because it conveys an interest in land to a municipality that converts the land to a public use. And that is all that the acquisition agreement provides for. It is true that in *Breidert* v. *Southern Pac. Co., supra,* 61 Cal.2d 659, 662, we held that a railroad can be liable in inverse condemnation when it acts alongside the state to cause an interest in land to be condemned. But

*Breidert* is distinguishable. There the railroad "was an active joint participant in closing [a] crossing" (*ibid.*) for the public benefit, creating a cul-de-sac where the crossing once gave property owners access to the network of public streets. No such "active joint participat[ion]" (*ibid.*) in creating a park appears in the acquisition agreement before us. The city alone is liable to plaintiffs for any taking of their land that may have occurred. Because plans for future appropriations of interests in land do not give rise to a cause of action in inverse condemnation (*Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110, 119-120 [109 Cal.Rptr. 799, 514 P.2d 111]), it is unnecessary to analyze liability for future takings of land or interests therein, including those accompanying or following future eminent domain or other proceedings.

### CONCLUSION

Whether the 1888 deed conveyed a defeasible fee or an easement is not an arcane academic question. With railroad rights of way currently being converted to other uses, sometimes with the possibility of resuming their original function, it is of considerable practical importance to interpret deeds of this type correctly. (See 16 U.S.C. § 1247(d) [converting railroad rights of way to trails and preserving them for future rail use]; 23 U.S.C. § 101(a), final par. ["term 'transportation enhancement activities' " includes "preservation of abandoned railway corridors"]; 49 U.S.C. former § 10906, now § 10905 [entitled "[o]ffering abandoned rail properties for sale for public purposes"].) The majority's interpretation is erroneous.

The Court of Appeal's judgment should be reversed insofar as it concludes that Santa Fe is jointly liable with the City of Manhattan Beach in inverse condemnation. In all other respects, its judgment should be affirmed.

**KENNARD, J.,** Dissenting.—I agree with the view expressed by Justice Mosk in his concurring and dissenting opinion that the 1888 deed at issue here conveyed an easement, and not, as the majority holds, a fee interest. As Justice Mosk points out, both the language of the deed itself (conc. and dis. opn. of Mosk, J., *ante,* at pp. 252-261) and the extrinsic evidence (*id.* at pp. 262-265) compel the conclusion that the interest conveyed was an easement.

Unlike Justice Mosk, however, I would hold liable for inverse condemnation not only defendant City of Manhattan Beach (the City), but also defendant Atchison, Topeka and Santa Fe Railway Company (Santa Fe),

because the latter was actively, and jointly with the City, involved in the condemnation of the property here in issue.[1]

The City and Santa Fe entered into a contract, the "Park Acquisition Agreement," to enable the City to develop a park on land involved here in exchange for certain benefits to be granted Santa Fe by the City. The contract states in relevant part: "This Agreement is for the purpose of carrying out the Project. CITY seeks to obtain certain public benefits as set forth herein. SANTA FE seeks to transform undeveloped property in CITY into developed property in accordance with the plan for the Project." Under the agreement, Santa Fe promised to indemnify the City against claims to title of the property here in issue and reserved the right to initiate eminent domain proceedings in the City's name. The City, in turn, agreed to cooperate with Santa Fe in eminent domain proceedings; to rezone property acquired by the City as open space; to grant Santa Fe redevelopment rights to part of the property retained by Santa Fe; to rezone property held by Santa Fe to allow for commercial planned development; and to help Santa Fe acquire access to property retained by Santa Fe. Because the Park Acquisition Agreement reflects significant actions by both the City and Santa Fe, I would hold them jointly liable for the inverse condemnation. (*Breidert* v. *Southern Pac. Co.* (1964) 61 Cal.2d 659, 662 [39 Cal.Rptr. 903, 394 P.2d 719] [railroad is proper party to inverse condemnation action if it was an active joint participant in taking property for public use].) This conclusion was also reached by the trial court and by the Court of Appeal.

I would affirm the judgment of the Court of Appeal.

Werdegar, J., concurred.

The petition of real parties in interest for a rehearing was denied June 19, 1996. Mosk, J., Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.

---

[1]Because the majority concludes that Santa Fe had full legal title in fee simple, it does not address the question of whether Santa Fe is jointly liable with the City for inverse condemnation.