Filed 8/18/22  Hoang v. Arrowhead Woods Architectural Committee CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| KEVIN HOANG et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>ARROWHEAD WOODS ARCHITECTURAL COMMITTEE INC.,<br><br>    Defendant and Respondent. | D079410<br><br><br><br>(Super. Ct. No. CIVDS1821729) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Thomas S. Garza, Judge.  Affirmed.

William M. Crosby for Plaintiffs and Appellants.

Law Offices of John G. Wurm and John G. Wurm for Defendant and Respondent.

A 1965 deed to a Lake Arrowhead residential property prohibits the owner from cutting down "any living tree" unless first approved by an architectural committee (Committee).  The primary issue in this case is whether this restriction is, as plaintiff-homeowners contend, unenforceable under the Marketable Record Title Act (Act) (Civil Code,[1] § 880.020 et seq.).  Disagreeing with plaintiffs, the trial court determined that the tree-cutting restriction was enforceable under an exception in the Act for equitable servitudes.

We affirm the judgment, although on different grounds.  The tree-cutting restriction is not enforceable by a " '[p]ower of termination' "—that is, a power reserved in the grantor to terminate the fee simple estate if the restriction is violated.  (§ 885.010, subd. (a)(1).)  Because there is no other statutory basis for applying the Act to this case, it does not matter whether the restriction is an equitable servitude.  Whatever it is, by its own terms it is not enforceable by a power of termination.  And that means the Act simply does not apply.  After also rejecting Homeowners' claims that (1) the restriction is invalid under the rule against perpetuities, and (2) the Committee lacked authority to enforce it, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Surrounded by the San Bernardino National Forest, the community of Lake Arrowhead describes itself as a "stunningly beautiful" mountain

---

[1]     Undesignated statutory references are to the Civil Code.

resort.[2]  It began 100 years ago, when in 1922 Robert G. Lester conveyed (among other parcels) "lots 1 to 95" of "Tract Number 53" to Title Insurance and Trust Company (Trust Company).

For reasons perhaps lost to history, the deed reserved in Lester "[a]ll the trees, and all the roots, branches and parts thereof, growing on or that may hereafter grow, stand or be upon any part of said Lot[s] . . . ."  On the same day by separate deed, Lester conveyed the trees, roots, and branches to Arrowhead Mutual Service Company (Mutual Service).  So somewhat curiously, for the next 43 years the lots and the trees that grew on them had different owners.

In 1965, as part of a settlement of unrelated litigation, Mutual Service quitclaimed "to the respective record owners of the land" all of its "right, title and interest in and to all of the trees and all of the roots, branches and parts thereof . . . ."  But this deed contained a restriction that prohibited the landowner-grantees from engaging in unapproved tree cutting:

> "PROVIDED, however, that the Grantees . . . will not cut down, remove or alter any living tree unless first approved by an Architectural Committee appointed by the Grantor herein, its successors or assigns."[3]

In 2007, Kevin Hoang and Nhung Tran (collectively, Homeowners) purchased Lot 84 in Tract 53, a piece of residential property about a mile from the lake.  The preliminary title report disclosed the 1922 conveyance by Lester to Mutual Service, excepting from coverage:

---

[2]     (Lake Arrowhead, In the Alps of Southern California <https://lakearrowhead.com> [as of Aug. 17, 2022], archived at <https://permalink.cc/PK75-6X8G>.)

[3]     This restriction was intended to increase property values in the entire area by preserving "the forest."

"Covenants regarding all the trees and all the roots, branches, etc., specifically conveyed by Robert G. Lester to the Arrowhead Mutual Service Company . . . by Deed recorded August 9, 1922 . . . ."

Their purchase agreement also disclosed the 1965 restriction:

"**Arrowhead Woods Architectural Committee ("AWAC")**:  Buyer is advised and hereby acknowledges that most properties located within . . . Arrowhead Woods are subject to and fall under the jurisdiction of the AWAC. Approval must first be obtained from AWAC before . . . new construction, remodeling, re-roofing, *tree trimming and/or removal*, exterior painting . . . ."[4]  (Italics added.)

In 2015, Homeowners removed two cedar trees from their property without first obtaining the Committee's approval.  Each tree was about 20 inches in diameter, and together they were valued at nearly $17,000.[5]  For trees that size, the Committee's bylaws provide a $10,000 fine per tree for unauthorized removal.

Ultimately, the Committee reduced the fine to $9,770 for both trees. When Homeowners refused to pay it, the Committee further reduced it to $5,000 in a small claims action alleging "[i]llegal tree cutting on property . . . ."  Homeowners cross-complained, seeking $10,000 for "[i]llegally impos[ing] fines, fees[,] [and] damages," trespass, and harassment.

---

[4]    Homeowners testified that their real estate agent assured them the tree-cutting restriction did not apply because their home was built in 1927 and the restriction applied only to newer construction.

[5]    Homeowners claimed the trees were dead, but photographs of cut branches showed green foliage.

The small claims court ruled in the Committee's favor on its complaint and against Homeowners on their cross-complaint. On appeal to the superior court, Homeowners lost again. They paid the $5,000 judgment.[6]

In 2018, Homeowners filed a first amended complaint (Complaint) against the Committee alleging six causes of action. The gravamen of the first five (violation of the Act, quiet title, slander of title, fraud, declaratory relief) is that the tree-removal restriction is unenforceable under the Act.[7] At trial, Homeowners also asserted the Committee lacked authority to enforce the restriction because it was assigned those rights by a corporate entity that had been dissolved years earlier.

By stipulation, trial was bifurcated into a bench trial on the issues involving the Act and bylaws, to be followed by a jury trial (if necessary) on the remaining claims. In a statement of decision, the court ruled in the Committee's favor, determining (1) the Act did not bar enforcement of the restriction because it was an equitable servitude ; and (2) under Corporations Code section 2010, Mutual Service validly conveyed its rights to the Committee, even though it had been dissolved years earlier. The court entered judgment in the Committee's favor on the first, fifth, and sixth causes of action, and dismissed the remaining causes of action as "moot."

---

[6]    Despite the final judgment on the merits (involving the same parties, issues, and trees), the trial court declined to apply claim or issue preclusion. On appeal, the Committee contends the trial court should have applied "[c]ollateral [e]stoppel." It is unnecessary to address that point since we affirm on other grounds.

[7]    The sixth cause of action seeks declaratory relief that the tree-removal restriction is unenforceable because of alleged voting irregularities in adopting the Committee's bylaws. In closing argument, however, Homeowners acknowledged they had "been enlightened on that point," by the evidence at trial and abandoned that claim.

DISCUSSION

A.   *The Tree-Removal Restriction is Not Subject to the Marketable Record Title Act*

    1.    *The Marketable Record Title Act:  Basic Principles*

In California, real property is "a basic resource" that the Legislature has declared should be "freely alienable and marketable to the extent practicable" to encourage its full use.  (§ 880.020, subd. (a)(1).)  Toward that end, in 1982 the Act was adopted " 'to simplify and facilitate real property title transactions by enabling persons to determine the status and security of recorded real property titles from an examination of recent records.' "  (*Robin v. Crowell* (2020) 55 Cal.App.5th 727, 749.)  It "operates like a statute of repose" by imposing outside time limits on the enforceability of certain interests in real property.[8]  (See *Aviel v. Ng* (2008) 161 Cal.App.4th 809, 817, fn. 4.)

The Act creates a recordation requirement for specific interests: mortgages and deeds of trust (§ 882.020), unexercised options (§ 884.010), powers of termination (§ 885.010), unperformed contracts for the sale of real property (§ 886.010), mineral rights (§ 883.110), and easements (§ 887.010).  As a general rule, these interests expire within a stated time period.  For example, mortgages and deeds of trust expire 10 years after the due date of the debt, if ascertainable from the record, or if not so ascertainable, 60 years

---

[8]   A statute of limitations normally sets the time within which proceedings must be commenced once a cause of action accrues, whereas a statute of repose limits the time within which an action may be brought and is not related to accrual.  A statute of repose thus is harsher than a statute of limitations because it terminates a right of action after a specified period of time, irrespective of accrual or even notice that a legal right has been invaded.  (See *McCann v. Foster Wheeler LLC* (2010) 48 Cal.4th 68, 78, fn. 2.)

after the date of recording. (§ 882.020.) Powers of termination expire 30 years after the instrument creating the power is recorded.[9] (§ 885.030.) These statutory periods may be extended, however, if the person claiming the interest timely records a "Notice of Intent To Preserve Interest" (Notice) in "substantially" the form provided in section 880.340. (See generally, 4 Miller and Starr, California Real Estate (4th ed. 2022) § 10:68.)

2. *The Tree-Cutting Restriction Is Not Enforceable by a Power of Termination*

In this case, Homeowners contend the tree-cutting restriction is subject to the Act because it is enforceable by a power of termination. Because the 30-year period under the Act was not extended, they claim the restriction expired no later than 1995 (30 years after the 1965 deed containing the restriction). If the restriction is not enforceable by termination, the Act simply does not apply in this case.

A power of termination is defined as "the power to terminate a fee simple estate in real property to enforce a restriction in the form of a condition subsequent to which the fee simple estate is subject." (§ 885.010, subd. (a)(1).) Courts do not, however, imply a power of termination. Because the power to terminate involves a potential forfeiture of the transferred interest, " '[t]here must be language used which is so clear as to leave no doubt but that the grantor intended that an estate upon condition subsequent should be created—language which *ex proprio vigore* [of its own force] imports such a condition.' " (*Savanna School District of Orange County v. McLeod* (1955) 137 Cal.App.2d 491, 494; see also *Sanders v. East Bay Mun.*

---

[9] Exceptions for a power conditioned on continued production of oil and gas or other minerals, and to separately owned fixtures removable at expiration of a lease, are not involved in this case. (See § 885.015.)

7

*Utility Dist.* (1993) 16 Cal.App.4th 125, 130 ["no provision in a deed relied on to create a condition subsequent will be so interpreted if the language of the provision will bear any other reasonable construction"].)

There are only two possible sources for a power of termination applicable to the tree-cutting restriction:  (1) the 1922 deed from Lester transferring Lot 53 (among others) to the Trust Company; and (2) the 1965 deed by which Mutual Service quitclaimed its interest in the trees to the owners of the respective lots, including the owners of Lot 53.[10]

We start with the 1922 deed, by which Lester conveyed lots in Tract 53 to Trust Company, but withheld the trees from the conveyance.  As to the property conveyed, Lester imposed 15 restrictions.  These included, for

---

[10]    In their supplemental brief and again at oral argument, Homeowners took inconsistent positions on whether any other deed contains a power of termination.  Initially in supplemental briefing, they conceded that the only possible sources for a power of termination are the above-mentioned 1922 and 1965 deeds.  Yet elsewhere in the same brief, they also claimed  a power of termination with regard to tree cutting is in a November 24, 1932 deed.  That 1932 deed (exhibit 59) is not mentioned in any of the principal briefs.  Nor does it appear to even include Lot 84 in Tract 53:

In any event, the 1932 deed excepts from the conveyance "all the trees and the roots, branches and parts thereof . . . ."  Thus, like the 1922 deed, it could not contain a power of termination with respect to tree cutting restrictions because the grantor retained the estate in the trees.  At oral argument, Homeowners' counsel also asserted the tree cutting restriction was contained in a fee simple determinable estate.  That contention is also untenable.  (See discussion *post* at fn. 14.)

example, that the property be used only for residential purposes, must contain certain plumbing fixtures, and cannot accumulate garbage.

The 1922 deed includes an express power of termination:

> "[U]pon any breach . . . of any of the conditions, restrictions and/or reservations herein contained . . . [,] the premises directly affected by such breach . . . shall forthwith revert to the Grantor, or his successors . . . , who shall have the right of immediate re-entry and possession."

But by definition, a power of termination—forfeiture—operates only as a condition on the *grantee's* estate. If the grantee engages in the prohibited conduct, the conveyed real estate interest reverts to the grantor. (§ 885.010, subd. (a)(1).) As Homeowners' concede, the power of termination contained in the 1922 deed could not apply to Lester's retained interest in the trees because he was the grantor. And it did not restrict the actions of the grantee because Trust Company had no interest in the trees. Lester retained them, then transferred them to a separate owner, Mutual Service.[11]

Unlike the 1922 deed, the 1965 quitclaim deed from Mutual Service makes no reference to any power of termination. Although it was the 1965 deed that created the restriction on cutting trees without approval of the Committee, nothing in the deed even hints that the homeowner grantee will forfeit any real estate interest by cutting a tree without advance approval. Given the absence of any language that would create a power of termination, and we conclude that as a matter of law the 1965 deed does not permit

---

[11]  Homeowners' expert, Lawrence Lacombe, agreed that under the 1922 deed, "[T]itle to the property ran to title insurance and trust company, but the trees did not." He also conceded that "since title of the trees didn't pass," any restriction regarding the tress in that deed "wouldn't apply." Thus, we understand Lacombe's testimony about the 1922 deed to be consistent with our conclusion that it does not contain a power of termination with respect to the trees.

enforcement of the tree removal restriction by termination of the owner's interest in the property.[12]

Seeking to persuade the trial court otherwise, Homeowners presented "expert" testimony from a title insurance underwriter, Lawrence Lacombe. Focusing on the 1965 deed, Lacombe testified that the Act "abolishes restrictions and conditions" and "converts them to power of termination."[13] From this premise, he opined that the tree-removal restriction in the 1965 deed had *become* a power of termination by Legislative fiat. On appeal, Homeowners continue to embrace this theory.

We reject this claim for several reasons. First and foremost, with exceptions not applicable here, expert testimony on the law is inadmissible. It is not the proper function of an expert to instruct the court on the law. It is the judge's role to determine what the applicable law is. (*N.G. v. County of San Diego* (2020) 59 Cal.App.5th 63, 77; *Downer v. Bramet* (1984) 152 Cal.App.3d 837, 842.)[14] Yet over objection, the trial court allowed Lacombe to testify "these things we used to call [CC&R's] were technically powers of termination in California under that Act of 1982."

---

[12]    It is solely a judicial function to interpret a written instrument, including a deed, unless the interpretation turns upon the credibility of extrinsic evidence. (See *City of Manhattan Beach v. Superior Court* (1996) 13 Cal.4th 232, 238.)

[13]    Although Lacombe did not cite the statute, he was apparently referring to section 885.020 which provides: "Fees simple determinable and possibilities of reverter are abolished. Every estate that would be at common law a fee simple determinable is deemed to be a fee simple subject to a restriction in the form of a condition subsequent. Every interest that would be at common law a possibility of reverter is deemed to be and is enforceable as a power of termination."

[14]    Moreover, Lacombe is not a lawyer and does not hold a law degree.

10

More significantly, the Act did not abolish CC&R's, nor did it transform them into powers of termination. What the Act abolished was a common law restraint on alienation called a fee simple determinable and possibility of reverter. A fee simple determinable is an estate that expires upon occurrence of a stated event. (*McDougall v. Palo Alto Unified School Dist.* (1963) 212 Cal.App.2d 422, 431.) A possibility of reverter is the name of the future interest held by the grantor after conveying a fee simple determinable. (*Severns v. Union Pac. R.R. Co.* (2002) 101 Cal.App.4th 1209, 1219, fn. 6.) For example, if the grantor conveys an estate to last for an indefinite time, measured not in lives or years, but in terms of use (e.g., so long as the property is used as a hospital), and provides the estate ends automatically when the land is no longer used for that purpose, the estate created in the grantee is a fee simple determinable. The reversionary interest—the possibility that the land will come back to the grantor if and when the specified situation no longer exists—is the possibility of reverter. The Act simplifies the law by making "every interest that would be at common law a possibility of reverter" enforceable as "a power of termination." (§ 885.020.)[15]

Nevertheless, the trial court apparently credited Lacombe's testimony on the applicable law. The statement of decision concluded that the tree-cutting restriction was a power of termination that expired. At the same time, however, the court articulated its own theory as to why the Act did not

---

[15]   At oral argument, Homeowners' counsel ultimately conceded the deeds do not contain a "possibility of reverter" with respect to tree cutting, yet at the same time claimed there was a "fee simple determinable." But counsel was unable to point to language in any of the deeds that would create a fee simple determinable with respect to unauthorized tree removal. Indeed, agreeing that the grantor did not retain a possibility of reverter impliedly concedes the grantee did not receive a fee simple determinable.

compel a ruling in favor of Homeowners.[16]  It reasoned that because the Committee "never sought reversion of title," but instead imposed monetary fines, it was appropriate to "treat the tree trimming and tree removal of [*sic*] an equitable servitude."  Then, citing section 885.060, subdivision (c), which exempts equitable servitudes from the Act, the judge rejected Homeowners' claim.[17]

Because the superior court's ruling was based on the equitable servitude exception to the Act, much of the parties' initial briefing assumed (as did the trial court) that the Act applied, and focused on whether the restriction was an equitable servitude. At our request, the parties filed supplemental briefs addressing (1) whether the restriction was enforceable by a power of termination within the meaning of the Act, and (2) if not, whether the judgment should be affirmed on those grounds instead.

Generally, an appellate court reviews the correctness of the trial court's judgment and not its reasons.  "[W]e will affirm the trial court's ruling on any theory established by the record." (*Baskin v. Hughes Realty, Inc.* (2018) 25 Cal.App.5th 184, 208, fn. 16.)  This rule applies even if the statement of

---

[16]    Objecting to the statement of decision, Homeowners noted, "Not only did [the Committee] not mention 'equitable servitudes' as an affirmative defense in its Answer, but there was no mention of this term throughout the trial . . . ."  Indeed, "equitable servitude" does not appear in the nearly 500-page trial transcript until defense counsel's *closing argument*, where it is ironically mistranscribed as "inequitable servitudes."  In any event, even the Committee acknowledges the issue was not litigated, stating in its appellate brief it "did not have an opportunity to present evidence or make a record that the recorded deed restrictions were equitable servitudes . . . ."

[17]    If the restriction for which a power of termination has expired "is also an equitable servitude alternatively enforceable by injunction" it remains enforceable by injunction "and any other available remedies," but not by a power of termination.  (§ 885.060, subd. (c).)

decision reveals the legal basis for the ruling was incorrect and lacks findings related to the correct theory, "provided that the record unequivocally establishes the requisite facts." (*Ibid*.) Applying these principles here, the trial court's ruling that the tree-cutting restriction is not made unenforceable by the Act is correct because (1) no deed created a power of termination with respect to the tree-cutting restriction, and (2) a power of termination was the only arguable basis for application of the Act. Accordingly, the ruling must be affirmed notwithstanding that it was based on different grounds.

B.      *The Tree Cutting Restriction Is Not Made Unenforceable by the Rule Against Perpetuities.*

In their supplemental brief, Homeowners alternatively contend the tree cutting restriction is unenforceable because it violates the Rule Against Perpetuities (the Rule). They assert that because the tree restrictions "are without any specified time limits," they are "de facto invalid as not vesting" within the meaning of the Rule, as codified in Probate Code section 21205.[18] At oral argument, counsel conceded this issue was not raised in the trial court, the opening brief, or even in the reply. He candidly conceded that it is also outside the scope of the issues we requested the parties to address in supplemental briefs.

The Committee asserts it is "entirely improper" to raise this issue "for the first time only weeks before oral argument and with no opportunity to develop a record or make a proper argument." Although we tend to agree, Homeowners' counsel accurately notes that because the Rule "is one of public

---

[18]    Probate Code section 21205 provides: "A nonvested property interest is invalid unless one of the following conditions is satisfied: (a) When the interest is created, it is certain to vest or terminate no later than 21 years after the death of an individual then alive[;] [or] (b) The interest either vests or terminates within 90 years after its creation."

policy" involving a question of law, courts have considered it even when raised for the first time on appeal.  (See *Wong v. Di Grazia* (1963) 60 Cal.2d 525, 532, fn. 9; *Woodward Park Homeowners Assn., Inc. v. City of Fresno* (2007) 150 Cal.App.4th 683, 714.)  In those cases, however, the parties had a fair opportunity to present their positions and the matter was fully briefed.  In *Wong*, for example, although the question arose for the first time at oral argument in the Court of Appeal, the issue was "fully argued" in the Supreme Court.  (*Wong*, at p. 532, fn. 9.)  And in *Woodward Park*, the appellate court raised the issue itself in a request for supplemental briefs.  (*Woodward Park*, at p. 714.)  In contrast here, we did not ask the parties to brief the issue, and the arguments are not fully developed.[19]

Ultimately, it is left to the reviewing court's discretion whether a party will be permitted to raise a new theory for the first time on appeal.  (*Sea & Sage Audubon Society, Inc. v. Planning Com.* (1983) 34 Cal.3d 412, 423.)  Under the circumstances, we are inclined to consider the point forfeited.  (See *People v. Price* (2017) 8 Cal.App.5th 409, 450, fn. 21 [argument beyond the scope of issues on which supplemental briefing was sought and also not raised in opening brief is forfeited].)

But even setting aside forfeiture, Homeowners' argument fails.  The rule against perpetuities "relates only to future interests in property, the vesting of which is to be postponed beyond the allotted time."  (*Dallapi v.*

---

19    For example, Probate Code section 21225, subdivision (a) excludes certain nondonative transfers from the statutory rule.  The Law Revision Commission comment states this is because "[t]he rule against perpetuities is an inappropriate instrument of social policy to use as a control on such arrangements.  The period of the rule—a life in being plus 21 years—is suitable for donative transfers only."  (Recommendations Relating to Uniform Statutory Rule Against Perpetuities (Sept. 1990) 20 Cal. Law Revision Com. Rep. (1990) p. 2532.)  Although this exclusion arguably might apply in this case, the supplemental briefs do not discuss it.

*Campbell* (1941) 45 Cal.App.2d 541, 544.)  Under the Rule, a provision that may cause an estate to commence in the future is invalid if, as a result, it may commence more than 21 years after a life or lives in being.  (*Ibid*; see Prob. Code, § 21202.)  In simple language, the rule against perpetuities is a rule against remote vesting.  It applies only to *nonvested* interests in real property.  (Prob. Code, § 21205; *Dallapi*, at p. 546 ["The rule . . . only applies to *future* interests in property, and is not concerned with such interests which are vested"].)

Here, the Rule does not apply because the case involves a restriction on the use of Homeowners' land, not a delay in vesting.  (See *McKinnon v. Neugent* (Ga. 1969) 167 S.E.2d 593, 594 ["the rule against perpetuities . . . deals with estates in land and the vesting of estates, and does not relate to covenants restricting the land to certain uses.  Thus, the restrictive covenants purporting to run for 25 years do not violate the rule against perpetuities and are not invalid for that reason"]; see also *Cornett v. Houston* (Tex.Civ.App. 1966) 404 S.W.2d 602, 605 [rule against perpetuities applies only to remotely vesting estates and not to restrictive covenants].)  Therefore, even if the perpetuities argument were properly before us, we would reject it.

C.  *The Committee Was Properly Assigned the Right to Enforce the Restriction*

As a third asserted basis for reversal, Homeowners contend there was no substantial evidence to support the trial court's finding that the Committee had "authority" to impose the tree-removal restriction.  As we understand it, the argument is based on two deeds.  The first is the 1922 deed, where Lester retained not only ownership of the trees, but also the "right to remove any of said trees whenever, in the opinion of said Grantor [i.e., Lester] or his successor in interest, removal of any tree . . . is necessary

15

for the improvement of the landscape, for the protection or reasonable use of improvements and/or buildings . . . ." The second is the 1965 deed where Mutual Service quitclaimed to the lot owners "all of Grantor's right, title, and interest in and to all of the trees," but also imposed the tree-cutting restriction. Putting both of these deeds together, Homeowners contend that "[s]ince Lester had reserved to himself" the power to restrict tree cutting in the 1922 grant deed, Mutual Service lacked the power to transfer any such restrictions [to the Committee] in the 1965 deed. More simply, the argument is that Mutual Service never held the right to restrict tree cutting, and it could not convey to the Committee that which it did not have.

This argument fails because it does not consider other conveyances.[20] Homeowners ignore the *other* 1922 deed—the one from Lester to Mutual Service where Lester conveyed his interest to "all the trees . . . together with the right to remove any of said trees whenever, in the opinion of said Arrowhead Mutual Service Company, its successor, or assigns, the removal of any tree, or trees, is necessary for the improvement of the landscape, for the protection or reasonable use of improvements and/or buildings . . . ." Thus, contrary to Homeowners' contention, Lester *did* convey his once-retained right to control tree-cutting. He conveyed it in 1922 to Mutual Service and its successors or assigns. Homeowners also overlook the 1986 deed in which Mutual Service quitclaimed its rights to Arrowhead Lake Association, as well

_____

[20] The argument may also be forfeited because it does not appear to have been raised in the trial court, which may also explain why the trial court did not address it in the statement of decision. Nevertheless, since the Committee does not assert forfeiture, and it involves a pure question of law on undisputed facts, we consider the point, even for the first time on appeal.

as the 1990 quitclaim deed from Arrowhead Lake Association to the Committee.[21]

In a related argument, Homeowners assert there is no evidence that an architectural committee "as mandated by the 1965 quitclaim deed, existed between 1965 and 1989 to administer" the tree-cutting restrictions. Once again, this appears to be new argument; there is nothing about it in the statement of decision. In any event, it is not persuasive. The 1965 deed did not "mandate" the creation of an architectural committee. It simply provided that one may be appointed by Mutual Service or its "successors or assigns" in the future. That happened when the Committee acquired its rights to enforce the tree-cutting restriction in 1990, some 17 years before Homeowners bought their Lake Arrowhead property.

---

[21] In the trial court, Homeowners also asserted that because Mutual Service was dissolved in 1978, it lacked the capacity in 1986 to assign its rights to enforce tree-cutting restrictions to the Arrowhead Lake Association. The trial court rejected that argument because under Corporations Code section 2010, even after dissolution a corporation retains the ability to assign its rights in its assets. Homeowners have expressly abandoned that issue on appeal, asserting in their opening brief, "Appellants do not contest the right of [Mutual Service], if it had possessed restrictions, to quitclaim same, even years after its dissolution pursuant to Corporations Code, 2010." In any event, even if not abandoned, we would reject it. A corporate dissolution is best understood not as a corporation's death, but merely as its retirement from active business. (*Penasquitos, Inc. v. Superior Court* (1991) 53 Cal.3d 1180, 1190.) Corporations Code section 2010, subdivision (c) provides that a dissolved corporation has the authority to collect and distribute assets discovered after the date of dissolution so long as it is part of the winding up process.

## DISPOSITION

The judgment is affirmed.  Respondent is entitled to costs on appeal.


DATO, J.

WE CONCUR:


IRION, Acting P. J.


BUCHANAN, J.